In re Michael J. KUDLA, Debtor.

Donald M. KARTCHNER, Plaintiff,

v.

Michael John KUDLA, Defendant.

Bankruptcy No. 88–B–03064–J.
Adv. No. 88–A–0929.

United States Bankruptcy Court,
D. Colorado.

Oct. 13, 1989.

Patricia K. Kelly, Duitch, Johnson & Ogawa, P.C., Colorado Springs, Colo., for plaintiff.

Michael John Kudla, Longmont, Colo., pro se.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

On March 15, 1988 the Debtor, Michael John Kudla ("Kudla" or "Defendant" herein), filed a bankruptcy Petition under Chapter 7 of the Bankruptcy Code in this Court. On October 28, 1988, the Plaintiff, Donald M. Kartchner ("Kartchner" or "Plaintiff" herein), filed an adversary proceeding pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), to except Plaintiff's $100,000.00 claim from discharge. A trial was held before this Court concluding on August 1, 1989. At the close of the Defendant's case, this Court granted the Defendant's Motion for a Directed Verdict pursuant to 11 U.S.C. § 523(a)(6), but denied the Defendant's Motion for a Directed Verdict under 11 U.S.C. § 523(a)(2)(A) and (a)(4).

## FINDINGS OF FACT

1. Defendant Kudla was, during all times pertinent to this case, an attorney registered to practice and practicing law in the State of Colorado.

2. Plaintiff Kartchner was a developer, contractor and investor located in California. In the spring of 1982, Kartchner desired to obtain loans for business purposes and was seeking loan funds and a lender for that reason.

3. David R. Larsen ("Larsen" herein) worked as Plaintiff's representative and sometimes agent for investigating loan and/or investment opportunities. On April 20, 1982, Plaintiff gave Larsen a limited power of attorney to act on Plaintiff's behalf to enter into loan transactions.

4. Ronald Madsen ("Madsen" herein), was an individual who worked out of Salt Lake City, Utah with persons interested in finding loan funds and capital. In this case, he worked with Larsen, Plaintiff's agent, and Bill Kennedy of Denver, Colorado ("Kennedy" herein) in Plaintiff's efforts to obtain loan funds. While Madsen testified that he was also an agent for Plaintiff in negotiating the financial transactions in this case, Plaintiff denied that Madsen was ever his agent. Madsen acknowledged that he did not have a power of attorney from Kartchner.[1]

5. Kennedy held himself out as an individual who could arrange and secure large amounts of funding, loans or capital, for borrowers and businessmen. He was introduced to the Plaintiff's agent, Larsen, by Madsen. Kennedy offered to acquire substantial loan funds for Kartchner in what can be characterized as a confusing transaction, at best, and an incomprehensible, unworkable scheme, at worst. While in 1982 Kennedy was undertaking with the Plaintiff the proposed loan transaction described herein, he was concurrently undertaking similar transactions with several other potential borrowers. Kennedy never testified at trial and no witnesses, particularly his former business associates Madsen and Defendant Kudla, could identify his current location or business. Kennedy just "disappeared" from Colorado.

1. Madsen and Kudla, the Defendant's only two principal witnesses, proved to not be credible witnesses and at times quite incredible.

6. Larsen communicated with and then met with Kennedy in Denver. Kennedy informed Larsen that substantial loan funds, perhaps $5,000,000.00, could be obtained for Kartchner if he, Kartchner, would purchase annuities with $100,000.00 to partially collateralize the loan.

7. Kennedy owned and/or controlled, and was an officer of, Uni–European Services of Colorado, Inc., a Colorado corporation ("Uni–European"). Uni–European was represented to be the organization which would actually obtain the loan proceeds and/or process the loan transaction. At the request and direction of Kennedy, Kudla established and became registered agent for Uni–European in early 1982. Kudla at all pertinent times served as attorney for Kennedy and Uni–European.

8. Larsen, Kennedy and Madsen, at various times, discussed a mechanism to transfer Plaintiff's $100,000.00 to purchase annuities and the use of an "escrow agent" to facilitate the transaction. Kennedy suggested Defendant Kudla as the escrow agent after Plaintiff Kartchner expressly rejected as unacceptable the original recommended escrow agent. Larsen contacted Kartchner who agreed that Kudla could act as escrow agent in this transaction due to the fact that he, Kudla, was a licensed attorney.

9. On May 24, 1982, Larsen and Madsen met with Kennedy to finalize the proposed transaction. In the Amended Escrow Instructions, it is stated:

This is to show that Don M. Kartchner has deposited $100,000.00 Into the First National Bank of Longmont, for down payment on annuities portfolio.

This transaction must take place within three weeks after the above date. On that date, $100,000.00 is to be wire transferred to Capital Bank, Alondra Studebaker office, Cerritos, California account

# 731006696 in behalf of Don M. Kartchner

Direct all correspondence to: David R. Larsen

    8447 S. Etienne Way

    Sandy, Utah 84092

The Amended Escrow Instructions, appended to the Escrow Instructions, were signed by Bill W. Kennedy, David R. Larsen, and Don M. Kartchner. On the face of the Amended Escrow Instructions was the handwritten notation and signature of Defendant Kudla:

Received on deposit May 24, 1982, $100,000 and a copy of this amended escrow instructions M.J. Kudla.

Kudla acknowledged receiving the $100,000.00 from Kartchner and signing the Amended Escrow Instructions instrument.[2] Unrebutted testimony indicates that Kudla subsequently assured Larsen and Kartchner that Plaintiff's funds were in his account and "were safe."

10. Kudla accepted Kartchner's $100,000.00 wired into his account identified as "Michael J. Kudla—Trustee Account," numbered 47–1003, located at First National Bank of Longmont ("Trustee Account" herein). Extensive unrebutted testimony shows that commingled in the same Trustee Account were additional sums deposited by (a) James Westford on May 20, 1982 and June 4, 1982 in the sum of $100,000.00, (b) C & H Escrow Company for Mr. Koon on June 4, 1982 in the sum of $50,000.00, and (c) Mr. Rickey on June 7, 1982 in the sum of $450,000.00. The testimony indicated that these individuals were involved in the same type of transactions with Defendant Kudla and Kennedy, as was Plaintiff Kartchner.[3]

11. Defendant was not able to produce and cogently explain the complete general ledger or account statements of his Trustee Account and testified that he apparently had lost certain of his records. What De-

---

**2.** The "Amended Escrow Instructions," coupled with the "Escrow Instructions," (Plaintiff's Exhibit I) were prepared and submitted by Kennedy and/or Kudla, both documents were signed simultaneously on May 24, 1982, and are, like other written records in this case, confusing and curious.

**3.** In June 1982, Kudla's Trustee Account received deposits totalling $804,390.61 and disbursements totalling $938,481.81. (Plaintiff's Exhibit H).

fendant Kudla submitted (or more accurately made available) was an incomplete, handwritten deposit and withdrawal ledger and some cancelled checks from his Trustee Account. Kudla's own records were brief, sometimes illegible, confusing, and at times, not comprehensible.[4]

12. Thomas L. Harkness, C.P.A., ("Harkness" herein) was accepted by the Court as an expert in asset tracing and explained many of the transactions which occurred in Kudla's Trustee Account. It was unrebutted that checks were drawn on Kudla's Trustee Account to pay obligations for Kudla's swimming pool, to purchase an automobile for Kudla, and to disburse or "loan" substantial sums of money to Kudla and his wife. Harkness testified that according to his analysis, Defendant used at least $106,000.00 from the Trustee Account for his and his wife's personal obligations, that Defendant gave Kennedy the sum of $97,452.49, and that Defendant had taken $250,000.00 to purchase a certificate of deposit in Defendant's own name.[5]

13. There was lengthy but confusing and conflicting evidence as to the ultimate disposition of the specific $100,000.00 deposited by Kartchner in Kudla's Trustee Account. That is understandable as all funds were commingled. Significantly, however, Kartchner never received his loan funds or his $100,000.00 back from Kudla.[6]

14. Defendant Kudla argued that Kennedy and Uni–European were the actual escrow agents. That argument is wholly without merit. It was Kudla who held the funds in his Trustee Account, and it was Kudla who served as the recipient and receipted for the funds. Kudla was the licensed attorney who acknowledged receipt of and presumably understood the Amended Escrow Instructions. The credible evidence overwhelmingly targets Kudla as the individual responsible for holding and not disbursing the funds until successful conclusion of the loan transaction. The written documents and the credible testimony reinforce the proposition, and the Court finds, that Defendant Kudla was the escrow agent and the party on whom Plaintiff Kartchner relied to be the escrow agent. Kennedy and/or Uni–European were, at best, the loan broker(s) who were to put the loan funds together and conclude the loan transaction.

15. There is no credible evidence that Kennedy ever effected or otherwise successfully concluded a single loan transaction, with or without the assistance of Kudla, despite a number of similar transactions undertaken by him.[7]

16. A three-day trial on this matter was held in state court in Utah in 1987. At the conclusion of that trial, that Court determined that it did not have jurisdiction, and no judgment was entered.

17. Kennedy was the architect who designed and was the person responsible for implementing this transaction with Kartchner and several similar transactions undertaken concurrently by Kennedy, Kudla and other potential borrowers. Kudla, however, was the engineer who made it work and, as an attorney on whom others relied including Plaintiff Kartchner, he gave the

---

4. Actually, virtually all Trustee Account records, particularly bank statements, were introduced into evidence by Plaintiff Kartchner. Kudla's personal records, exemplified by Plaintiff's Exhibit T, are, standing alone, unintelligible and reflect astonishing brevity and lack of care in Trustee Account recordkeeping.

5. Kudla's $250,000.00 Certificate of Deposit, purchased about June 11, 1982, was used as collateral on a personal loan to Kudla. The loan went into default and the lender took the Certificate of Deposit in satisfaction of Kudla's debt.

6. Kennedy, as President of Uni–European, on November 18, 1982 conveniently effected a "for-feiture of the option deposit ... of $100,000.00" because Larsen ostensibly "interfered with the funding of this loan...." (Defendant's Exhibit 5). All other evidence suggests that the $100,-000.00 was to be used as a tool for collateral, not as an option. The credible evidence also demonstrates that, understandably, Kartchner and Larsen became active in investigating the transaction and the failure to return the money, after Kudla and Kennedy failed to produce the loan or the cash.

7. Evidence suggests that between March and December, 1982, Kennedy and Kudla conducted at least five proposed loan transactions similar to Kartchner's. They all failed.

transaction an appearance of legitimacy and propriety. Both persons were instrumental in Kartchner's transaction. While Kennedy was the purported boss, Kudla was a willing, knowing and self-serving participant. Kartchner's transaction, standing alone or in the context of the other transactions, appears to be the product of a scam.[8]

### CONCLUSIONS OF LAW

The Court must narrowly construe exceptions to discharge against the creditor and in favor of the debtor. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Wade,* 43 B.R. 976, 981 (Bankr.D.Colo.1984). "Exceptions to discharge are construed narrowly, and the burden of proving that a debt falls within a statutory exception is on the party opposing discharge." *In re Black,* 787 F.2d 503, 505 (10th Cir.1986).

### EXCEPTION TO DISCHARGE PURSUANT TO SECTION 523(a)(2)

In 11 U.S.C. §§ 523(a)(2)(A) it is stated: A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

A creditor seeking to have a debt declared non-dischargeable under Section 523(a)(2) must prove that the debt comes within the statute by clear and convincing evidence. *In re Black, supra* at 505.

The Bankruptcy Court has exclusive jurisdiction to determine the meaning of false pretenses and false representations and need not, but may, look to state law. *Matter of Pappas,* 661 F.2d 82 (7th Cir.

1981). It is not necessary that the false pretenses or representation be made in writing in order that the debt be excepted from discharge. *See, Talcott v. Friend,* 179 F. 676 (7th Cir.1910), *aff'd.* 228 U.S. 27, 33 S.Ct. 505, 57 L.Ed. 718 (1913).

In *In re Wade, supra* at 980, it was held that a creditor must prove the following allegations to exempt a debt under Section 523(a)(2) of the Bankruptcy Code.

(1) the debtor made a false representation of fact; (2) the fact was material; (3) the debtor made the representation knowing it to be false; (4) the debtor made the representation with the intent that the creditor act in reliance on the representation; (5) the creditor relied on the representation; (6) the creditor's reliance was justified; and (7) the reliance caused damage to the creditor.

*See, Colorado Jury Instructions 2d—Civil,* § 19:1; *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937).

In addition to proving each of the above seven elements of fraud or false representations, the creditor must prove that the debt be for "obtaining money, property, services, or an extension, renewal, or refinance of credit." (11 U.S.C. § 523(a)(2); *In re Wade, supra* at 980.) This has been interpreted to mean that the debtor receive the benefits of the property. To meet the requirements of this subsection, the debtor needs to receive some benefit from the property, but not necessarily the property itself. (The so-called "receipt of benefits" theory.) *Id.* at 981–82; *In re Winfree,* 34 B.R. 879, 883 (Bankr.M.D.Tenn.1983). Moreover, as stated by the Court in *In re Black, supra,* "this section [523(a)(2)(A)] includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality."

It is sufficient to recognize that this Plaintiff, under Section 523(a)(2)(A), has a

---

**8.** The credible evidence indicates that Kennedy was running a highly questionable, deceptive operation, if not an outright unvarnished scam. Kennedy has, indeed, totally disappeared and none of the parties or witnesses could give any indication where he is or what he is now doing. Other individuals who have purportedly been deceived by Kennedy have also been unsuccessful in efforts to locate Kennedy.

high burden of proof and a broad range of specific elements to prove in order to prevail. This Court concludes that the Plaintiff has proved his case.

■ Kudla verbally, and in writing as well, represented that he would hold Kartchner's funds as escrow agent until a loan was obtained and a loan transaction was concluded. Failing a loan, he would return the funds promptly. He represented thereafter on repeated occasions that Kartchner's funds were still secure and in his Trustee Account when they were not. Kartchner justifiably relied on Kudla's representations to his substantial detriment and damage.

Despite Kudla's protestations of innocence, ignorance of any wrongdoing, and good faith dealing, the evidence reveals his personal conduct of almost simultaneously receiving funds to be held in trust and using those trust funds, in significant part if not in whole, for personal expenses, family luxuries, and investment purposes.

The Court is fully persuaded that false pretenses and false representations, if not actual fraud, have been proved by a clear and convincing margin. Indeed, it is inescapable for this Court to conclude that, at a minimum, Kudla's conduct here "involves implied misrepresentation [and] conduct intended to create and foster a false impression, as distinguished from a 'false representation' which is an express misrepresentation." *In re Schmidt*, 70 B.R. 634, 640 (Bankr.N.D.Ind.1986).

The history and facts of this case create, perhaps, a classic case of false pretenses and false representations justifying the survival of Kartchner's claim in bankruptcy. That the deceit was made easier and more effective because Kudla is a licensed attorney, and Kartchner relied on that fact, simply makes the Debtor's conduct that much more egregious.

## EXCEPTION TO DISCHARGE PURSUANT TO SECTION 523(a)(4)

Section 523(a)(4) of the Bankruptcy Code provides:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

With respect to fraud or defalcation, the creditor must first establish that the debtor owed a fiduciary duty to the creditor. "Although the questions of fiduciary status under this provision [523(a)(4)] is one of federal law, state law is an important factor in determining when a trust relationship exists." *In re Black, supra* at 506. A fiduciary relationship for dischargeability purposes may exist where a state statute has defined a particular relationship as fiduciary. *In re Gagliano*, 44 B.R. 259 (Bankr.N.D.Ill.1984). The meaning of fiduciary under federal laws is much stricter than the general common law definition of a fiduciary as a relationship involving confidence, trust and good faith." *In re Midkiff*, 86 B.R. 239 (Bankr.D.Colo.1988).

In bankruptcy, the meaning of fiduciary is limited in application to an express or technical trust. The "debts alleged to be non-dischargeable must rise from the breach of trust obligation imposed by law, separate and distinct from any breach of a contract." *Id.*, at 241 *citing In re Currin*, 55 B.R. 928 (Bankr.D.Colo.1985). "An implied or constructive trust is insufficient. It is axiomatic that before there can be a trust, there must be a *res* or particular property entrusted to the fiduciary for the benefit of another." *In re Wade, supra* at 983.

Attorneys are held to the highest standard of fiduciary obligations.

All fiduciaries are held to a duty of fairness, good faith and fidelity, but an attorney is held to an even higher degree of responsibility in these matters than is required of all others.... The fiduciary obligation of a lawyer applies to persons who, although not strictly clients, has or should have reason to believe he/she can rely upon him.

*Matter of Goldberg*, 12 B.R. 180 (Bankr. D.N.J.1981).

In this matter, Plaintiff knew that Kudla was an attorney and, relying upon that fact, wired the sum of $100,000.00 to his Trustee Account with the justified belief that it would be kept safe. Kudla knew and understood that escrowed funds impose fiduciary obligations on those in control and knew that Kartchner and Larsen had relied on his status as escrow agent and as an attorney to protect those funds. This Court concludes that a binding and legally sufficient fiduciary relationship existed between Plaintiff Kartchner and Defendant Kudla.

Having demonstrated that Kudla should be held to the care and obligation of a fiduciary to Kartchner, Plaintiff must still prove that Kudla committed fraud or defalcation while acting in that fiduciary capacity to have the debt owed to Plaintiff held nondischargeable.

Defalcation under Section 523(a)(4) is broader than embezzlement or misappropriation.

While defalcation, in the context of Section 523(a)(4) does not always lend itself to a precise definition, it is clear that it is more encompassing than either 'embezzlement' or 'misappropriation.' [Citations omitted] [W]hen a fiduciary takes money ... he is guilty of a 'defalcation' though it may not be a 'fraud' or an 'embezzlement' or perhaps even a 'misappropriation.' *In re Currin, supra* at 934.

Defalcation is broad and encompassing. It can, under proper facts, be "a mere deficit resulting from the debtor's misconduct, even though he received no personal gain," and may be through negligence or ignorance rather than misconduct. *In re Cowley*, 35 B.R. 526, 529 (Bankr.D.Kan.1983).

Colorado law on the duties of fiduciaries is clear. C.R.S. § 15–1–501 (1987) provides:

Fiduciary property kept separate. Every fiduciary shall keep fiduciary property separate and distinct from such fiduci-

ary's own property and shall not invest or deposit the same with any person, association, or corporation in such fiduciary's own name....

Defendant specifically violated this provision by withdrawing $250,000.00 from his attorney trust account and depositing that amount in a time certificate in his own name.

C.R.S. § 15–1–505 (1987) provides:

Records. The records of every fiduciary shall at all times show the ownership of any fiduciary property held by such fiduciary or in the name of its nominee or held in a depository.

The Code of Professional Responsibility as adopted by the Colorado Supreme Court, D.R. 9–102(B)(3), C.R.S. (1973) provides:

A lawyer shall: Maintain complete records of all funds, securities, and other property of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

The Defendant has admitted that he failed to do so.

By virtually any definition or standard, Kudla is guilty of defalcation and a breach of his fiduciary obligations. As a fiduciary he engaged in inexcusable, unexplained wrongful conduct. As an attorney, serving as an escrow agent and fiduciary as well, he also discredited himself, the profession, and the legal community.

This Court finds that Defendant's conduct constituted defalcation, he did not meet the obligations of a fiduciary under Section 523(a)(4), and the Plaintiff's claim is not discharged in bankruptcy.[9]

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment shall enter in favor of Don M. Kartchner, Plaintiff, and against Michael John Kudla, Defendant, and that the debt owed to the Plaintiff in the principal sum of $100,-

---

**9.** The Court also concludes that, as an alternative theory on which this debt can be excepted from discharge pursuant to Section 523(a)(4), Kudla's conduct may well constitute "embezzlement" as that term is defined and applied in bankruptcy cases. However, further elaboration and additional grounds are not needed or useful in this case. *See, In re Wallace,* 840 F.2d 762 (10th Cir.1988).

000.00, plus interest at the legal rate,[10] is deemed not dischargeable under the Bankruptcy Code.

**10.** Interest at the legal rate according to state statute, commencing the date on which the funds were to have been returned to the Plaintiff from the Defendant.