**In re Ronald Lee DUNSTON and Laura Marie Dunston aka Laura Marie Lindsay, Debtors.**

**Joy EVANS aka Joy Castro, Plaintiff,**

v.

**Ronald Lee DUNSTON, Defendant.**

**Bankruptcy No. 88–B–09871–E.**
**Adv. No. 88–A–1069.**

United States Bankruptcy Court, D. Colorado.

Aug. 6, 1990.

James E. Mitchem, Mitchem and Mitchem, P.C., Denver, Colo., for plaintiff.

Jeffrey Cohen, C. Forrest Morgan, Cohen & Herm, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Adversary Complaint of Plaintiff Joy Evans ("Evans" or "Plaintiff" herein), filed against the Defendant/Debtor Ronald

Lee Dunston ("Dunston" or "Defendant" herein), seeking to have her claim as a creditor excepted from discharge pursuant to Section 523(a)(2) of the Bankruptcy Code.

This case presents the situation of a son attempting to discharge debts owed to his mother in Bankruptcy Court and the mother suing to have those debts declared nondischargeable. On the heels of the failure of Dunston's, the son's, businesses and his failure to repay his mother, Evans, and following prior state court litigation, the mother and son are now battling in the Bankruptcy Court. This Court, having held a trial on this matter, having reviewed the documents, and being sufficiently advised in the premises, makes the following findings and conclusions:

1. Plaintiff Evans is the mother of Defendant Dunston.

2. For a number of years, Dunston had been involved in the operation, management, and marketing activities of several restaurants and bars, including Boston Gardens, The Majestic Saloon, and Ronnie D's (collectively referred to as "Businesses").

3. Dunston testified that he never owned any stock in any of the Businesses with which he was associated, but testified that, as a result of his role and activities in these Businesses and the fact that these Businesses were generally owned and operated by close friends and members of Dunston's family, generally his immediate family, Dunston had the right under some form of "option" or other agreement to acquire, or control, ownership and distribution of the common stock of those Businesses.

4. Except for Dunston's own testimony, there was no corroborative evidence produced of the "option" Dunston claims to have held to acquire shares of stock in any of the three subject corporations. No written option agreement(s), no terms or conditions of the option(s), and no proof of other prior disclosure of the option(s) in any medium (financial statements, memoranda, etc.) were produced at the trial.

5. Dunston testified that he was a convicted felon. With a felony conviction, Dunston was subject to restrictive state liquor law licensing statutes. For example, disclosure of an actual, direct or effective financial interest by a felon in the Businesses which served liquor, could lead to an investigation by licensing authorities of Dunston and/or the Business(es), and could jeopardize the right of the Business(es) to hold liquor licenses. No specific evidence of the circumstances of the conviction were presented to the Court.

6. Admitted into evidence is a Colorado Department of Revenue Liquor Enforcement Division record concerning Ronnie D's, Incorporated, which had been issued a hotel and restaurant liquor license. The records show that at all times pertinent Theresa Lindsay Morley was the sole stockholder of the corporation. The applications for licenses and renewals thereof do not show that Dunston had any direct or indirect financial interest in Ronnie D's except as a sublessor of the business premises.

7. The Court admitted evidence from the Colorado Department of Revenue Liquor Enforcement Division concerning Boston Gardens, which had been issued a tavern liquor license. The records show that at all times pertinent Laura M. Dunston, the wife of the Defendant, was a stockholder of the corporation and at different times, Marc Carlozzi and Richard Levinger had common stock. Various other individuals were preferred stockholders. The applications for licenses and renewals do not show that Dunston had any direct or indirect financial interest in Boston Gardens.

8. The Court admitted evidence from the Colorado Department of Revenue Liquor Enforcement Division concerning Great Colorado Management Company d/b/a The Majestic Saloon, which had been issued a 3.2 beer license. The records show that since 1980, the stockholders have been either John R. Evans or Christine Burns. The applications for licenses and renewals do not show that Dunston had any direct or indirect financial interest in Great Colorado Management Company d/b/a The Majestic Saloon.

9. Paul Schumaker, an official with the Commerce Bank of Aurora and a lender with whom Dunston had done business, testified that it was his understanding that Dunston had the ability to control conveyances of stock interest in Boston Gardens, The Majestic Saloon and Ronnie D's. This understanding was based on the fact that when Commerce Bank of Aurora required that stock in these Businesses be pledged to secure loans to finance the operations of these Businesses and this requirement was conveyed to Dunston, arrangements were made for the stock to be pledged.

10. As a result of discussions between Dunston and Evans over a period of time, but generally prior to July, 1986, Evans had the belief and understanding that Dunston was the owner and/or was in control of Boston Gardens, The Majestic Saloon, and the soon-to-be opened Ronnie D's. That understanding appears reasonable and fully justified under the circumstances.

11. Dunston testified that he had held a number of discussions, over time, with his mother, Evans, concerning his desire to get her an ownership interest in his business enterprises; to make her a "partner" in his Businesses. Dunston testified he had talked to Evans "for a year or so" about conveying some stock to his mother.

12. On July 22, 1986, Dunston flew from Denver to Kansas City in order to receive $25,000.00 from Evans. This transaction followed telephone calls and conversations initiated by Dunston wherein Dunston conveyed to his mother an immediate need for money. Dunston said this money was to "get him out of a jam."

13. There is conflicting evidence whether the $25,000.00 was to be a loan or was the first part of a payment for which Evans would receive stock in the Businesses from Dunston. Dunston received the $25,000.00 from Evans and executed two different promissory notes to evidence a promise to repay.

14. Shortly after Evans advanced $25,000.00 to Dunston on July 22, 1986, Dunston talked again with Evans about becoming a "partner" or "investing" more money in the Businesses.

15. Dunston testified that on or about July 29, 1986, he discovered that former business partners of his had taken in excess of $30,000.00 in tenant finish money that was required to establish Ronnie D's. Dunston's testimony made it clear to the Court that he was facing potentially severe financial difficulties.

16. Dunston and Evans held additional conversations in which Dunston made it clear to Evans that he immediately needed and desired additional funds. On July 29, 1986, again at Dunston's initiative, Evans advanced additional funds to her son for his Businesses. Evans wired $35,000.00 to Aurora National Bank which, in turn, issued a cashier's check to Dunston on July 30, 1986.

17. Evans testified that before the $35,000.00 was wired to Dunston, there was a definite agreement between them for (a) the repayment of the money loaned, that (b) she, Evans, was to receive common stock in Dunston's Businesses consisting of 20% of Ronnie D's, 5% of Boston Gardens, 5% of The Majestic Saloon, and 10% of Dunston's next venture, and that (c) she was to have a management contract for her employment upon the opening of Ronnie D's. Written notes appear to corroborate this discussion.

18. According to Dunston, further and "more extensive discussion" about the stock transfers ensued between Dunston and Evans shortly after July 29, 1986.

19. Around November 1986, Evans came to Denver to live and work at Ronnie D's. Somewhat less than one month later, Evans became upset one evening during work at Ronnie D's, left Ronnie D's, packed her personal belongings, and returned to Missouri.

20. Dunston began making payments to Evans. These payments were made by check drawn on Ronnie D's account. Evans was repaid $3,890.00 of the $60,000.00 she had provided to Dunston.

21. On July 31, 1987, Evans filed an action against Dunston, Laura Dunston, Boston Gardens, and Ronnie D's in Arapahoe County District Court, Civil Action No.

A–87–CV–1226. The state lawsuit ultimately ended in a default judgment being entered in favor of Evans and against the defendants.

22. On July 26, 1988, Dunston and his wife, Laura Dunston, filed a Petition pursuant to Chapter 7 of the Bankruptcy Code.

23. The Court's review of the Debtors' bankruptcy filing reveals that the Debtors failed to disclose the rights and interests Dunston now claims he held in Ronnie D's, Boston Gardens, and The Majestic Saloon, under Schedule B–2–t, "Stocks and Interest in Incorporated and Unincorporated Companies," itemized separately, and in Schedule B–2–v, "Equitable and Future Interests, Life Estates and Rights or Powers Exercisable" for the benefit of Dunston, the Debtor, and in Schedule B–3–b, "Property of Any Kind Not Otherwise Scheduled." There is no reference in the Debtors' Schedules of any option rights or interests, or any transfer of such rights or interests, prior to July 26, 1988, the date of filing of the Petition.

24. On November 29, 1988, Evans filed the within Adversary Complaint seeking to have the entire amount of the state court default judgment found to be a non-dischargeable debt.

25. Evans asserts three theories of relief. First, that the judgment entered in the state court lawsuit collaterally estops this Court from relitigating the question of non-dischargeability and the Bankruptcy Court should enter a judgment of non-discharge of the debt accordingly. Second, that the debt is excepted from discharge pursuant to Section 523(a)(2)(B). Third, that the debt is excepted from discharge pursuant to Section 523(a)(2)(A).

26. The Bankruptcy Court determined that it was not collaterally estopped from relitigating the question of non-dischargeability due to the fact that the state lawsuit judgment was by default and it had not been litigated by Dunston, nor had Dunston had a full and fair opportunity to litigate the question due to procedural irregularities in the state court.

27. After hearing Evans' case-in-chief, pursuant to Dunston's motion to dismiss, this Court entered an Order on April 24, 1990, *nunc pro tunc* April 3, 1990, finding that Evans had not met her burden of proof that the debt was excepted from discharge pursuant to Section 523(a)(2)(B) and that claim was dismissed pursuant to Rule 41, F.R.Civ.P.

28. The trial was continued until May 17, 1990 at which time the Court heard Dunston's case in defense of the remaining claim brought by Evans pursuant to 11 U.S.C. § 523(a)(2)(A).

## DISCUSSION

■ The Court must narrowly construe exceptions to discharge against the creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *In re Wade*, 43 B.R. 976, 981 (Bankr.D.Colo.1984). "Exceptions to discharge are construed narrowly, and the burden of proving that a debt falls within a statutory exception is on the party opposing discharge." *In re Black*, 787 F.2d 503, 505 (10th Cir.1986).

*Exception to Discharge Pursuant to Section 523(a)(2)(A)*

In 11 U.S.C. §§ 523(a)(2)(A) it is stated: A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

A creditor seeking to have a debt declared non-dischargeable under Section 523(a)(2) must prove that the debt comes within the statute by clear and convincing evidence. *In re Black, supra* at 505.

■ The Bankruptcy Court has exclusive jurisdiction to determine the meaning of false pretenses and false representations and need not, but may, look to state law. *In re Kudla*, 105 B.R. 985, 989 (Bankr.D. Colo.1989); *Matter of Pappas*, 661 F.2d 82

(7th Cir.1981). It is not necessary that the false pretenses or representations be made in writing in order that the debt be excepted from discharge. *See, Talcott v. Friend,* 179 F. 676 (7th Cir.1910), *aff'd,* 228 U.S. 27, 33 S.Ct. 505, 57 L.Ed. 718 (1913).

In *In re Wade,* it was held that a creditor must prove the following allegations to except a debt from discharge pursuant to Section 523(a)(2)(A) of the Bankruptcy Code.[1]

(1) the debtor made a false representation of fact; (2) the fact was material; (3) the debtor made the representation knowing it to be false; (4) the debtor made the representation with the intent that the creditor act in reliance on the representation; (5) the creditor relied on the representation; (6) the creditor's reliance was justified; and (7) the reliance caused damage to the creditor.

*In re Wade, supra* at 980.

*See, In re Kudla, supra* at 989; *Colorado Jury Instructions 2d—Civil,* § 19:1; *Morrison v. Goodspeed,* 100 Colo. 470, 68 P.2d 458 (1937).

In addition to proving each of the above seven elements of fraud or false representation, the creditor must prove that the debt was for "obtaining money, property, services, or an extension, renewal, or refinance of credit." (11 U.S.C. § 523(a)(2); *In re Wade, supra* at 980.) This has been interpreted to mean that the debtor receive the benefits of the property. To meet the requirements of this subsection, the debtor needs to receive some benefit from the property, but not necessarily the property itself. (The so-called "receipt of benefits" theory.) *Id.* at 981–982; *In re Winfree,* 34 B.R. 879, 883 (Bankr.M.D. Tenn.1983). "Moreover, as stated by the Court in *In re Black, supra,* this section [523(a)(2)(A)] includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud im-

plied in law which may arise in the absence of bad faith or immorality." *In re Kudla, supra* at 989.

Significantly, most of the applicable case law in this District, with respect to Section 523(a)(2)(A), is almost exclusively focused on "actual fraud" and "false representation."[2] It does not directly address "false pretenses" as a basis to except a debt from discharge pursuant to Section 523(a)(2)(A). There is a dearth of law on the specific subject of "false pretenses." In this regard, the instant case is one of first impression.

### State Law Considerations

State law and liquor licensing requirements are not dispositive or decisive in this case. They do, however, in the context of the evidence produced, bear on the motivation, conduct, and credibility of Dunston.

Colorado Revised Statute, Section 12–47–111 prohibits a liquor license being granted to a person who is not of good moral character. Dunston's felony conviction raises the question of whether he is a person of good moral character. His felony conviction evidently does not, in itself, prevent him from obtaining a liquor license, but does give rise to inquiry as to whether he was disqualified from ownership entirely, and the pertinent circumstances connected with the felony conviction.

Colorado Revised Statute, Section 12–47–129(4)(a) generally prohibits any person from having a direct or indirect financial interest in more than one liquor license. An exception exists in the case of hotel and restaurant licenses which permits a person to have a direct or indirect interest in multiple hotel and restaurant licenses. Even in the case of a hotel and restaurant license, as with other licenses, the licensee is required to provide a complete disclosure of all persons having any direct or indirect

---

**1.** Significantly, *In re Wade* involved only claims of "actual fraud" and "false representations," not "false pretenses."

**2.** *In re Mullet, supra,* involved claims of a "materially false writing (Section 523(a)(2)(B)) and "actual fraud." The central issue in *Mullet* was

the "reasonable reliance" element. *In re Black, supra,* concerns "fraud" and "defalcation" (Section 523(a)(2)(A)). *In re Kudla, supra,* principally addressed "false representation" and "defalcation" while *In re Wade, supra,* only considered "actual fraud" and "false representation."

financial interest in the license. The purpose of this requirement is to prevent the control of any license by any person other than the licensee. Violation of the statutory requirement subjects the licensee to possible suspension, revocation of the license and, under C.R.S. § 12–47–130, to possible criminal violation.

Dunston has placed himself on the horns of a dilemma. On the one hand he argues that he controlled and had the ability to obtain the equity positions and convey, or cause to be conveyed, shares of stock in these various Businesses. He maintained that he had the right and authority to control the stock, the ownership, of these Businesses. On the other hand, however, owning, controlling, obtaining these equity positions, and conveying, or causing to be conveyed, the ownership of the Businesses could subject Dunston and/or the Businesses to possible license disqualification or civil liability, or perhaps even criminal violations of the Colorado statutes. The inconsistencies, no—the contradictions, in Dunston's story are substantial and significant.

### Conclusions

From the evidence presented at trial, the Court draws four conclusions which are decisive with respect to the legal issues before the Court.

First, the Court concludes that Dunston did *not* have an option right or rights, as claimed, or any legally binding and enforceable option right(s), to acquire the common stock of the subject Businesses. On the contrary, virtually all the evidence, except Dunston's testimony, suggests that (a) such rights never actually existed, but (b) if they somehow existed, they did so only in the mysterious, murky and veiled world of Dunston's business relationships; they were not legally binding enforceable contract rights.

Second, the Court concludes that *if* Dunston had an option right to acquire stock in these Businesses, then he purposely failed to disclose his "option," or other rights and interests in the Businesses, to state authorities and to this Bankruptcy Court. *If* Dunston had option rights or authority over the stock, or controlling ownership of the Businesses, then by design and deceit he purposely and knowingly concealed such rights.

Third, the Court concludes that Dunston is simply not a credible witness. Dunston's testimony was laced with inconsistencies and rife with ambiguity. His testimonial gymnastics required the Court to discount his recollection of events and communications. This observation is drawn as much from Dunston's own testimony as from other evidence presented at trial. By contrast, the Court found Evans to be the more credible witness in these particular matters.

Finally, the Court concludes that, pursuant to Section 523(a)(2)(A), two separate grounds justify excepting a portion of Evans' $60,000.00 principal claim against Dunston from discharge in bankruptcy. First, Dunston made a "false representation" to Evans and, second, Dunston acquired the funds from Evans by "false pretenses." Each provision, standing alone, justifies excepting from discharge Evans' claim for the second advance of money, the $35,000.00 transfer to Dunston on July 29, 1986.

### False Representations

When the facts of this case are measured against the standards of Section 523(a)(2)(A), the Court concludes that, at least in part, the claim of Evans against Dunston is excepted from discharge. The criteria outlined in *In re Mullet,* 817 F.2d 677 (10th Cir.1987) are satisfied by clear and convincing evidence.

The Court is convinced that Dunston acquired the funds from Evans based on false representations. The false representations consisted of claims that (a) he owned and/or controlled the stock and ownership of the three Businesses, and (b) he could—and would—transfer to Evans specific amounts of stock in each of the three designated Businesses in consideration of funds advanced to Dunston by Evans.

The Tenth Circuit Court case of *Mullet* requires, *inter alia,* for a debt to be held non-dischargeable, a finding that the creditor actually relied upon the false representations and that such reliance must be reasonable. This Court will look at the two transactions separately, principally because of that feature of the *Mullet* test.

■ The evidence indicates and the Court concludes that Evans provided the $25,000.00 to Dunston on July 22, 1986 *primarily,* but certainly not exclusively, because the money was requested of her *by her son.* It was, in some measure, a maternal response to her son's plea for help. The evidence does not convincingly show a strong and significant reliance by Evans, at that time, that she would receive stock in the Businesses from Dunston in exchange for *this specific $25,000.00 advance* of funds.

■ The evidence shows that extended and more detailed discussions were held by Evans and Dunston before Evans agreed to provide the additional $35,000.00 to Dunston on July 29, 1986. Both Evans and Dunston made contemporaneous notes of conversations on July 29, 1986 when Evans wired the money to Denver for Dunston. The notes reflect and the testimony strongly suggest that Dunston discussed and led Evans to believe that Evans would receive stock in the three designated Businesses, in specific amounts, in exchange and in consideration for the funds provided by Evans to Dunston.

Evans believed that Dunston owned and controlled the Businesses and could provide the stock which the two of them discussed. Evans reasonably and justifiably relied upon Dunston's representations. Dunston made the representations with the intent that Evans rely on his representations. Dunston was, by his own admission, desperate for the money. This reliance on the part of Evans caused damage to her in that she provided funds to Dunston which she very likely would not have done had she known the truth, i.e. Dunston did not own, control, or hold a legally binding or enforceable option, or right, to the stock of the Businesses and he could not—and did not—transfer stock to Evans. Evans has established by clear and convincing evidence each of the elements required under 11 U.S.C. § 523(a)(2)(A) as to the $35,000.00 extended by her to Dunston.[3]

### False Pretenses

Section 523(a)(2)(A) specifically and independently provides that a debt may be excepted from discharge if it was incurred in circumstances of "false pretenses" as distinguished from "actual fraud" and "a false representation." There is little case law which defines or distinguishes "false pretenses."

■ An analysis of a statute begins with the language of the statute itself. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). If the language of a statute is clear, that language must be given effect—at least in the absence of a patent absurdity. *Matter of Folendore,* 862 F.2d 1537 (11th Cir. 1989). Each phrase and provision of a statute should be given meaning, if possible, and resort to legislative history is appropriate only if there is ambiguity or confusion. *Central Trust Co. v. Official Creditors' Committee,* 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982); *Rocky Mountain Oil and Gas Ass'n. v. Watt,* 696 F.2d 734 (10th Cir.1982).

■ Where no definition is provided by the statute, the general rule is that the words are to be interpreted in their ordinary, everyday sense. *U.S. v. Mayberry,*

---

**3.** *If,* arguably, one could conclude from the evidence that Dunston did, indeed, have an option to acquire the stock in the subject Businesses or that he otherwise controlled the stock and decided who owned these Businesses, still this Court believes the funds advanced to Dunston might, still, have been advanced due to false representations purveyed by Dunston. Dunston agreed on or before July 29, 1986 to convey the specified stock in the specified Businesses to Evans. Evans then wired the $35,000.00. Dunston thereafter never transferred, or conveyed to Evans any common stock in any of the subject Businesses at any time. Indeed, there is no evidence whatsoever that Dunston made any effort, or attempted in any manner, to transfer stock in the Businesses to Evans on or after July 29, 1986.

774 F.2d 1018 (10th Cir.1985). "False pretenses" is defined as a "designed misrepresentation of existing fact or condition whereby person [sic] obtains another's money or goods." Black's Law Dictionary 723 (4th ed. 1968). "Pretense" is further defined in Webster's Dictionary as "a claim made or implied," or alternatively, a "make-believe fiction" or "false show." Webster's New Collegiate Dictionary 932 (9th ed. 1983).[4]

Several cases lend some guidance in defining and applying "false pretenses." The Court in *In re Kudla, supra* at 990, referenced the language of *In re Schmidt*, 70 B.R. 634 (Bankr.N.D.Ind.1986) as defining "false pretenses" to be conduct which:

> [I]nvolves implied misrepresentation [and] conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation.
>
> *Id.* at 640.

In *Matter of Weinstein*, 31 B.R. 804 (Bankr.E.D.N.Y.1983), the Court held that a debtor's failure to dispel a creditor's misunderstanding of the debtor's financial condition and the extent of collateral available on a secured loan may constitute "false pretenses" in the course of obtaining an extension of credit. The court reasoned that by use of *"implied misrepresentation or conduct,"* a false impression was fostered in the creditor and that may be conduct relegating a debt non-dischargeable as a false pretense under Section 523(a)(2)(A).

> It is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under 523(a)(2)(A).
>
> *Id.* at 810.

The recent decision of *In re McCoy*, 114 B.R. 489 (Bankr.S.D.Ohio 1990) summarizes the nature and extent of case law applying "false pretenses" under Section 523(a)(2)(A), as follows:

> An intent to deceive may logically be inferred from a false representation or false pretense which the debtor knows or should know will induce another individual to part with property (or services). [Citation omitted.] A "false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. [Citations omitted.] A false pretense has been defined to include a "mute charade," where the debtor's conduct is designed to convey an impression without oral representation. [Citation omitted.] A "false representation," on the other hand, is an expressed misrepresentation. It need not be a written misrepresentation; oral misrepresentations have been found to be actionable. [Citations omitted.] Even a debtor's silence may constitute a materially false misrepresentation prohibiting discharge of the indebtedness.
>
> *Id.* at 498.

In *McCoy* the court decided, in a case rather similar to the one at bar, that the debtor misled the creditor into believing he owned and continued to own certain assets when, in truth and in fact, he did not; they were spirited off to family members. The court in *McCoy* concluded that a creditor's claim was not dischargeable, in part, based on "false pretenses" which included,

> [A]s a part of Debtor's overall scheme, his false impression and mute charade concerning his ownership interest in ARC and ACMV. [Footnote omitted.] This conduct was specifically designed to assure [plaintiff] that Debtor had the financial resources to repay a significant obligation.
>
> *Id.* at 499.

Perhaps the most artful characterization of "false pretense" is in *Matter of Thomas*, 12 B.R. 765 (Bankr.N.D.Ga.1981).

> A false pretense may well be a passive posture, an expressed or manifest attitude which is assumed to mislead the damaged party. It may be a mute charade to express the attitude; that is, it may be conduct designed to convey an impression without oral expression.

---

4. The term "pretense" is deemed, generally, synonymous with "pretending," "fabrication," "guise," "false show," "hoax," "artifice," and "pretext." The Synonym Finder, p. 932, by J.I. Rodale (1978).

*Id.* at 769.

State case law provides some help in defining "false pretense," by way of a criminal case. "False pretense" is a *scheme* creating a false appearance; an "apparent, but falsely and fraudulently created situation of fact." *Johnson v. People,* 110 Colo. 283, 290, 133 P.2d 789 (1943).

 This Court construes "false pretense" in the context of Section 523(a)(2)(A) to mean, generally, a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor. "False pretense" may, but does not necessarily, include a written or express false representation. It can consist of silence when there is a duty to speak.

A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

"False pretense" is more like a con game than a stickup. It is more like being dealt from the bottom of the deck than being mugged. A false pretense is generally employed by stealth, implication, and misdirection, while fraud and false representations are typically implemented more by fabrication, explication and diversion.

 This Court is convinced and the conclusion is almost inescapable that Dunston, knowingly and by design, acquired the second advance of funds from Evans under "false pretenses." He created and fostered in Evans a distinct and profoundly misleading understanding of their transaction—most clearly with regard to the second advance of $35,000.00, if not also the first advance of $25,000.00. The conduct of Dunston constituted, unmistakably, a series of communications which, when considered collectively, created and fostered in Evans a false and misleading understanding of his position and their business transaction. Evans was wrongfully induced to advance the funds, the $35,000.00, and Dunston did it knowingly and willfully ... by design.

### Punitive Damages

 This Court held in its April 3, 1990 Order that this Court was not collaterally estopped from relitigating the question of nondischargeability due to the fact that the state lawsuit judgment was by default and it had not been litigated by Dunston. Therefore, the punitive damages awarded in that state court default judgment are dischargeable unless this Court finds that such damages are warranted by applicable law and facts in the case. *See, In re Austin,* 93 B.R. 723 (Bankr.D.Colo.1988). Although bankruptcy courts have held that punitive damages may be awarded in a dischargeability action even when there has been no prior determination of punitive damage liability, *see, In re Barnett,* 95 B.R. 477 (Bankr.W.D.Ky.1988), this Court does not find that punitive damages are warranted.

### ORDER AND JUDGMENT

For the reasons set forth above, it is ordered as follows and judgment shall enter accordingly:

1. The $25,000.00 provided to Ronald Lee Dunston, Defendant, by Joy Evans, Plaintiff, shall not be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

2. The $35,000.00 provided to Ronald Lee Dunston, Defendant, by Joy Evans, Plaintiff, shall be and is hereby excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

3. Prejudgment interest at the rate allowed by Colorado law is awarded on the $35,000.00 from the date of July 30, 1986.