In re Patrick Lee **HARGROVE**, Debtor.

**ITAPARICA, LTD.,** Plaintiff,

v.

Patrick Lee **HARGROVE,** Defendant.

Bankruptcy No. 93–00111–C.
Adv. No. 93–0266–C.

United States Bankruptcy Court,
N.D. Oklahoma.

March 3, 1994.

---

Scott Bradshaw, Tulsa, OK, for plaintiff.

James W. Keeley, Tulsa, OK, for debtor/defendant.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

This matter comes on to be heard upon the complaint of Itaparica, Ltd. ("Itaparica") asking that its debt against Patrick Lee Hargrove ("Debtor") be declared nondischargeable and that judgment be entered in its favor in the amount of the nondischargeable debt.

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157.

### STATEMENT OF FACT

Debtor filed for relief under Chapter 7 of the Bankruptcy Code on January 15, 1993. Itaparica is a creditor of Debtor and is a corporation duly organized and existing under the laws of the country of Brazil having its principal place of business in Sao Paulo, Brazil.

On November 14, 1991, Debtor wrote a letter to Itaparica containing the following language.

Dear Sir:

I am planning a gemstone purchasing trip to Brazil within the next three months. I am an independent dealer, based out of Cairo, Egypt (US citizen), with my market being custom jewelry designers and individuals in the US and Europe. My previous gem buying has all been conducted in Africa and the Far East but to fulfill my clients' needs better I need some of the

beautiful material available from your country.

Additionally, the letter listed twenty-three different semi-precious gemstones that he was interested in buying.[1] The letter further stated colors needed and the type of cuts. The letter concluded that if Itaparica was interested in doing business, it should respond.

The manager of Itaparica, Dante Mannaro, ("Mannaro"), responded to Debtor's letter and detailed the type of stones Itaparica had available. Thereafter, a series of letters were exchanged between the parties whereby they discussed the purchase by Debtor of semi-precious stones from Itaparica. In each of the letters Debtor showed great knowledge of the type and nature of semi-precious stones as well as their colors and designs. He indicated several times that he was in the business of buying and selling semi-precious stones and that he had a customer base and clients to whom he could sell the stones.

For example, in a letter dated February 28, 1992, from Debtor to Mannaro, Debtor states that his customers are custom jewelry designers and that he had orders for certain types of stones which he described. In a letter of March 12, 1992, Debtor explains that he was going to Sri Lanka, Hong Kong and Bangkok and that he also planned a trip to Africa in regard to his gemstone business.

Debtor planned a three-week trip to Brazil to buy precious stones and to discuss future business relations with Mannaro. Debtor arrived in Sao Paulo on March 20, 1992, and stayed ten days at Mannaro's house. They became fast friends and Mannaro took him around Sao Paulo and helped him purchase precious stones. Debtor had with him $10,-000.00 in cash and used this money to purchase the precious stones. He did not purchase any semi-precious stones from Itaparica as this was going to be done in the future. Debtor wore a big ruby ring which he represented to be worth $20,000.00.[2] He made many statements to Mannaro that he had clients all over the United States and Europe

that wanted to purchase gemstones from him and that in order to make the sales he had to have unusual, unique or avant garde stones cut by the lapidary to his specifications. During these conversations, Debtor always displayed great knowledge about semi-precious stones.

Following his return from Brazil, Debtor and Mannaro kept in contact regarding the types of stones Debtor needed. In a letter of April 21, 1992, Debtor stated that things were progressing well in Denver and that the stones were "a knock out [sic] for [his] clients." (Apparently these were pictures or drawings of the stones as none of them had been shipped to Debtor at this time). In a letter of April 29, 1992, Debtor states "I can sell all day, every day at a good price" in reference to a large stone specially designed in accordance with Debtor's drawings. In all of these letters, Debtor showed great knowledge of gemstones, including the types, their colors and designs.

In a letter of July 20, 1992, Debtor suggested that he and Itaparica enter into a partnership arrangement whereby Itaparica would buy the stones from the mines, polish or tumble them in a rough manner and take them to a lapidary where they would be cut according to Debtor's designs. After the lapidary had cut the stones, they would be shipped to the United States to Debtor at various locations and he would sell them to his customers who were custom jewelers. The custom jewelers would make them into finished products such as necklaces, bracelets, broaches and so forth.

Mannaro, on behalf of Itaparica, agreed to the arrangement. Thereafter, Debtor notified Mannaro that he had opened a bank account in Miami, Oklahoma to provide funds to pay the lapidary. Debtor shipped ten blank checks to Mannaro for payment of the lapidary costs. Debtor instructed Mannaro to obtain the stones from the lapidary, pay for the cutting and ship them to him in the United States.

---

**1.** Semi-precious gemstones are distinguishable from precious jewels such as diamonds, rubies and emeralds.

**2.** It turned out later he could not sell the ring for $10.00.

This process began in August 1992 when Mannaro made the first shipment of stones to Debtor. Mannaro used one of the checks in the amount of $1,000.00 to pay the lapidary costs and this check cleared the Miami bank in due course. Mannaro, without authority from Debtor, also used one of the checks written in the amount of $2,000.00 to purchase special stones to be cut into "Batman" figures. This check also cleared.

It takes thirty to thirty-five days for a check delivered in Brazil to clear a bank in Oklahoma. During this period, seven other shipments were made and seven other checks were delivered to the lapidary for a total of $7,000.00. Debtor received the stones and attempted to sell them in the United States. All of the seven checks failed to clear the Miami bank because of insufficient funds. In October, the relationship was terminated and no further stones were shipped to Debtor. The total costs of the stones to Itaparica that were shipped to Debtor was $4,000.00.

Debtor wrote a series of letters to Mannaro explaining the great difficulty he was having in selling the stones. He stated that his traveling expenses to the twenty different cities where he called on more than 400 jewelers exceeded the amount he received from the sale of the stones. Debtor never gave a formal accounting of the receipts and expenses, although Mannaro requested him to do so many times. Debtor also explained that he was having great difficulty in collecting monies and that many checks he received from his customers had bounced and that some of the jewelers had closed or had been robbed.

On October 27, 1992, Debtor wrote a letter to Mannaro admitting that he had lied, that he had received no bad checks, no stores had been robbed and no stores had closed. Debtor explained in detail his travels to the various cities and the problems he had encountered. In sum, he stated that he received $4,200.00 from the sale of the gemstones but that his expenses were $3,800.00.

Debtor did not appear at the trial but his testimony was offered by way of deposition. He had lived in Africa for several years and had taught school. He stated that during this time he bought and sold semi-precious stones as a hobby but not as a business. When he quit teaching school in August 1991, he decided to go into the semi-precious stone business. In 1991, he spent one month in Sri Lanka where he purchased some stones and sold them for $1,000.00. He did not make a profit on these transactions.

It was immediately after his stay in Sri Lanka that he began his communications with Itaparica. Actually, therefore, his first business transaction in semi-precious stones was with Itaparica. Debtor had no experience in the business nor did he have an established customer base or clientele. Prior to his involvement with Itaparica, he had merely pursued the sale of gemstones as a hobby.

Itaparica contends that Debtor was acting under false pretenses in that he represented that he was an established gemstone dealer with an established customer base and that stones purchased by him could be easily sold to his customers in the United States and around the world. Itaparica stated that it reasonably relied upon these pretenses and representations because Debtor had great knowledge of the gemstone business and actually came to Sao Paulo with $10,000.00 and purchased precious stones.

Debtor contends that he did not engage in any false pretenses or make any misrepresentations and that this transaction was merely a failed business deal whereby he in good faith attempted to sell the gemstones but could not. Debtor maintains he had no intent to defraud and that he did the best he could in attempting to market the stones. Debtor further contends that even if the Court finds that he was guilty of false pretenses or misrepresentations, Itaparica did not reasonably rely upon them in entering into this business transaction.

Itaparica contends that it has incurred damages in the amount of $7,000.00 for the bounced checks to the lapidary plus $4,000.00 for purchasing the stones from the mines.

Debtor contends that, if he owes the $11,-000.00 and it is determined to be nondischargeable, he is entitled to a set-off of $2,000.00 because Mannaro used $2,000.00 from the Miami account without authoriza-

tion to purchase the Batman gemstones. Debtor points out that it was because of this $2,000.00 purchase that some of the checks for the lapidary failed to clear the bank.

## CONCLUSIONS OF LAW

Itaparica contends that its debt should be excepted from discharge pursuant to § 523(a)(2)(A), which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtors or insiders financial condition[.]

11 U.S.C. § 523(a)(2)(A).

■ In order to prove the nondischargeability of its debt, Itaparica must establish by a preponderance of the evidence that:

1. The debtor made a knowingly false representation or pretense;

2. The representation or pretense was made with the intent to deceive the creditor;

3. The creditor reasonably relied upon the representation or pretense; and

4. The creditor sustained a loss as a result of the debtor's representation or pretense.

*Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Mullet,* 817 F.2d 677 (10th Cir.1987).

■ Generally, a false representation refers to an express misrepresentation whereas a false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression. *In re Scarlata,* 127 B.R. 1004 (Bankr.N.D.Ill.1991); *In re Dunston,* 117 B.R. 632 (Bankr.D.Colo.1990).

In *In re Dunston,* 117 B.R. 632 (Bankr. D.Colo.1990), the Court defined "false pretenses" as follows:

[A] series of events, activities or communications which, when considered collectively, create a false and misleading set of

circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....

A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

■ The Court finds that Debtor made false representations to Itaparica and knowingly created a false impression that he was an experienced gemstone dealer with an established line of customers when, in fact, he was not. He exhibited great knowledge of gemstones and described specific types and cuts which his customers allegedly wanted to purchase. Despite his extensive knowledge, Debtor's representation that he was a "dealer" of gemstones with existing customers was false. Debtor admitted his first business venture in gemstones was with Itaparica.

The evidence indicates and the Court concludes that the misrepresentations were made with the intent to induce Itaparica to enter into a business relationship with Debtor and that Itaparica did, in fact, enter into such an arrangement. Moreover, given Debtor's extensive knowledge of gemstones and his continual assurances that he had customers who were ready to purchase the stones it was reasonable for Itaparica to rely on Debtor's representations. Debtor opened a checking account and provided Mannaro with blank checks to pay for the lapidary costs. Debtor presented himself as one with the financial ability to cover such costs. He held himself out to be a world traveler. He went to Brazil with $10,000.00 in cash and used all of the funds to purchase precious stones.

■ Itaparica alleges that it incurred damages of $7,000.00 for the lapidary costs and $4,000.00 for the purchase of the stones for a total of $11,000.00. The Court finds

that Debtor is entitled to a set-off of $2,000.00 for the unauthorized purchase by Mannaro of the stones to be cut into Batman shapes. Debtor did not request nor approve of such a purchase. Therefore, Itaparica is entitled to a nondischargeable debt in the amount of $9,000.00.

A separate Judgment Order consistent with this Memorandum Opinion will be entered.