**In re Robert L. WADE, Debtor.**

**Robert L. SIMMONS and Carol C. Simmons, Plaintiffs,**

v.

**Robert L. WADE, Don Wade, as Co-Conservator for Robert L. Wade and Robert J. Cunningham, Trustee for Robert L. Wade, Defendants.**

**Proceeding No. 84 J 0330.**

United States Bankruptcy Court, D. Colorado.

Nov. 29, 1984.

Miles M. Gersh, Fishman & Gersh, P.C., Denver, Colo., for plaintiffs.

H. Christopher Clark, Inman & Flynn, P.C., Denver, Colo., for defendants.

Robert J. Cunningham, Englewood, Colo., trustee.

## MEMORANDUM OPINION, ORDER, AND JUDGMENT

ROLAND J. BRUMBAUGH, Bankruptcy Judge.

Plaintiffs seek money damages from Debtor under sundry theories and a determination that these damages are non-dischargeable under 11 U.S.C. § 523.

In June, 1981, Plaintiffs, having become entitled to approximately $1,000,000.00 from the sale of a family business, were referred to Robert L. Wade, the Debtor, and a Mr. Schwartz by their estate planning attorney. Schwartz and Wade were supposed to be financial planners and advisors. After some initial contacts between Plaintiffs, Schwartz and Wade, it was agreed that Wade was to prepare a computer generated financial plan for Plaintiffs and Schwartz was to "oversee" the project. It was stressed that a strong element of trust had to be formed between Plaintiffs and Wade. To that end, Plaintiffs were to fill out and submit to Wade detailed personal and financial questionnaires and to engage in intensive interviews with Wade. For this service, Plain-

tiffs agreed to a fee of $6,000.00 to $7,200.00. They paid $4,000.00 down with the balance due upon completion of the plan. Plaintiffs never received a "plan" from Wade.

In the interim, because Plaintiffs were already beginning to receive payments of approximately $30,000.00 per quarter, Wade agreed to advise Plaintiffs on short-term investments pending completion of their plan. Plaintiffs, a young couple, stressed that they wanted "conservative investments so as not to lose money to inflation" and to "keep the principal intact and get enough income to live". At the time Mrs. Simmons had four years of college education, although she had not received a degree, was attending school and working as a volunteer in alcohol treatment. Mr. Simmons had a degree in economics. He had worked for the family business (a precious metals refining business) full time from 1970 to 1976, first in a management training program, and later as Personnel Director and Plant Manager. In 1976, he moved to Colorado and worked in various group home and mental health programs. At the time of the meeting with Wade, Mr. Simmons was unemployed. Plaintiffs had made some previous investments in bonds and preferred stock through a Chicago broker, but these investments were not profitable.

During the summer of 1981, Wade told Plaintiffs to invest in money market certificates because they were safe and would allow Plaintiffs to accumulate money for other investments. Nevertheless, during that summer, Wade persuaded Plaintiffs to invest in an insured municipal bond trust, an oil and gas program, a real estate partnership, some "penny" stock, and a "no load" insurance program. Wade identified the "penny" stock and the insurance program as "risky". Only $1,000.00 was put into "penny" stock and the insurance program was "risky" because it was a "new idea". However, Wade said he knew the principals, one of whom was Mr. Schwartz. No other investments were identified by Wade as "risky". During the first ten (10) months of the association with Plaintiffs, there was a good relationship and Wade was readily available to answer Plaintiffs' questions and give his advice.

During the winter of 1981–82, Wade began talking of a timber processing company that was using an innovative technique for the harvesting of timber for firewood. It was to be safer for the environment (no "clear cutting"), and it was all done with mechanization, i.e., something other than "chain saws and pickup trucks". Wade told Plaintiffs he was involved with the project, was a principal, and was quite excited about it.

In approximately March, 1982, Wade told Plaintiffs if they put $100,000.00 in a certificate of deposit ("CD") at the South Denver National Bank, the bank would in turn loan money to three (3) companies, i.e., "Richland" (later determined to be Richland Timber Industries Venture, # 1, Limited, a Colorado limited partnership), Great Western Pet Products (a sole proprietorship), and a catering company being started in Vail, Colorado, by two people, one of whom was a friend of Wade's wife.

Another of Wade's associates, Mr. Ray Van Cleave, and Wade were supposed to have invested substantially in Richland and the loan was to enable Richland to buy machinery for use in its "mechanized" harvesting and processing of lumber for firewood. Wade assured Plaintiffs of the sound prospects for Richland and never indicated any undue risks.

Wade said the lady starting the pet products business had been in business ten to fifteen years and wanted to own her own business. Wade assured Plaintiffs that he would oversee the business as far as the bookkeeping, management, etc.

Plaintiffs were to receive interest from the CD plus "consulting fees" from each of the three companies, even though it was always understood no consulting services would ever be provided by Plaintiffs.

Plaintiffs purchased the CD, but were surprised when the bank required they pledge the CD as collateral for the three loans and also required Plaintiffs to sign as co-debtors on the promissory notes. When

Wade was confronted by Mr. Simmons with this information, Wade said it was just a "bank formality" and the principals on the loans were the ones really responsible so the Plaintiffs had nothing to worry about.

On or about April 1, 1982, Mr. Simmons signed a pledge of the CD and three (3) promissory notes as follows:

1. $35,000.00 wherein Wade and Van Cleave were co-debtors—this was supposed to be for Richland;

2. $10,000.00 wherein Marylyn Lyons and James Best were co-debtors—this was for the catering company; and

3. $30,000.00 wherein Linda Rose and Rebecca Mosier were co-debtors—this was for the pet products company.

Each of the notes were ninety (90) day notes. The catering company paid its loan and Wade persuaded Plaintiffs to reinvest this $10,000.00 in the lumber company. So on June 8, 1982, that $10,000.00 was loaned to Wade and Van Cleave as was the original $35,000.00 loan for Richland. Mr. Simmons stressed to both Wade and the bank that these loans must be paid by December 31, 1982, because Plaintiffs would need the cash for tax payments.

In the meantime, Wade persuaded Plaintiffs to purchase another $100,000.00 CD and to pledge that CD to the bank for an additional loan to Wade and Van Cleave of $75,000.00. Again, Plaintiffs signed the promissory note on or about April 28, 1982. The purpose of this loan was to finance the construction of a road by Richland for its timber harvesting activities. This loan was repaid in October, 1982, and was past due at the time.

In November, 1982, Wade wanted Plaintiffs to purchase a CD at the Wray State Bank for a "financing package" for a "lease company". Wade said the CD would be unencumbered. However, when the papers were presented for Plaintiffs' signatures, the bank wanted the CD pledged as collateral in the same fashion as the transactions with the South Denver National Bank. Plaintiffs refused to sign the documents and, after some difficulty, cashed the CD and reinvested the money elsewhere.

By the end of 1982, the loans for the pet products company and for Richland were in default. Plaintiffs demanded and received financial statements from Wade and Van Cleave. Wade assured them the Richland loan would be paid from an agricultural crop sale and Wade would obtain money from his mother to pay the pet products loan.

In January, 1983, the loans were not repaid. Wade said he had an appointment at the bank to pay off the loans, but he never kept that appointment. The loans were past due and the bank liquidated the CD and applied $79,856.44 of the proceeds to pay off the loans, remitting the balance to Plaintiffs.

Wade disappeared in January, 1983, and did not reappear until around the Memorial Day holiday in May, 1983, claiming that he was suffering from amnesia and could not recall anything of a personal nature prior to approximately February 1, 1983.

It was later learned that Linda Rose, although she had been in the pet grooming business since 1965, had never been in the business of selling pet products on the wholesale level. She had tried to obtain loans, including SBA loans, for her new business but was unsuccessful because she had insufficient capital. She and Wade knew there were already three major competitors in the area that had been in business from ten to twenty years. Wade wanted financial statements from Ms. Rose and Ms. Mosier, which they furnished. Both showed negative net worth. Wade also wanted an income and expense projection for the new business, which Ms. Rose furnished. That projection showed nothing on how or when the $30,000.00 would be repaid. When the note came due at the end of June, 1982, the bank told Rose that although the note was being renewed, it would come due on December 31, 1982. Ms. Rose, being concerned, called Wade who told her. "Don't be alarmed. I will take care of everything. Just pay the interest and the consulting fees." Rose also furnished, at that time, a projected pay-off statement showing Wade

the loan would not be repaid until July, 1983. Ms. Rose also told Wade that she had used $3,000.00 of the loan to cure defaults on the mortgages for her personal residence. Wade told her "that was all right, everybody does it—just don't take too much". The business folded in September, 1982. In mid May, Ms. Mosier had already left the business (she was a bookkeeper by trade and was to do the bookkeeping for the new company). The second bookkeeper left the first week in July, 1982. Although Wade knew all these things, he never told Plaintiffs anything except that things were going well.

Wade also did not tell Plaintiffs that Richland Lumber was a limited partnership; the $175,000.00 original capital of Richland was used by April, 1981; several major risks had been identified in the Richland Private Placement Memorandum (see Plaintiffs' Exhibit 1, pp. 14–22); Wade had usurped major control over the company from the start; Wade had declared to the named general partner, Richard Myron, in January, 1982, that Richland was not going to purchase a "shear" even though this was the key piece of equipment for mechanization; Richland, by January, 1982, was so far behind on its bills the newspapers would not accept its advertising; and Richland, by December, 1981, had already spent $60,000.00 on the road which was to have cost $75,000.00 and the road was only one-half completed. Nor did Wade tell Plaintiffs of Myron's almost total inexperience with harvesting, selling and distributing firewood. The last day Myron saw or heard from Wade was the day before Thanksgiving in November, 1982.

At trial, Plaintiffs narrowed their claims of non-dischargeability to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4) with respect to the pet products loan and the two (2) outstanding loans to Wade and Van Cleave ostensibly for the benefit of Richland in the total of $45,000.00.

Section 523(a)(2)(A) provides as follows:
A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud ...

■ To have a debt declared non-dischargeable under this section, a creditor must prove:

1. The Debtor made a false representation of fact;

2. The fact was material;

3. The Debtor made the representation knowing it to be false;

4. The Debtor made the representation with the intent that the creditor act in reliance on the representation; ·

5. The creditor relied on the representation;

6. The creditor's reliance was justified; and

7. This reliance caused damage to the creditor.

*See Colorado Jury Instructions 2d— Civil,* § 19:1 and the cases cited thereunder. These seven (7) elements establish liability for deceit based on fraud in Colorado and proof of these elements satisfy the requirements of subsection (A) of § 523(a)(2).

However, there is another element that must be proven and that is that the debt be for "obtaining money, property, services, or an extension, renewal, or refinance of credit" as specified in subsection (2) of § 523(a).

There has been disagreement in the courts whether a Debtor must actually and personally receive the money, property or services. Three (3) lines of cases have emerged.

The first line finds its origin in *Rudstrom v. Sheridan, et al.*, 122 Minn. 262, 142 N.W. 313 at 314 (1913), when the court stated
... that the purpose of the law was to prevent the bankrupt from retaining the benefits of property acquired by fraudulent means. In order, therefore, to bring the statute into operation, and prevent

the full discharge of the bankrupt it should be made to appear that property of some kind, tangible or intangible, was thus obtained by him.

Although this language from the *Rudstrom* case is often cited for the necessity that the Debtor personally receive property, this language is pure *dicta*. The facts of that case reveal that the creditor suffered no damage and therefore had failed to prove the necessary elements of fraud. As the court stated:

Here Plaintiff parted with no property or property right ...

A second view had its genesis in *Hyland v. Finch*, 178 N.Y.S. 114, 115 (1919). Under this interpretation "If it is shown that the bankrupt derives a benefit from the property obtained he comes within the provisions of the statute in question, which by its very terms places no limitations as to whom the property is obtained for". This has been characterized as the "receipt of benefits" theory. *In re Winfree*, 34 B.R. 879 at 883 (Bankr.M.D.Tenn.1983).

The *Hyland* court relied on language from an earlier case, *In the Matter of Dunfee*, 219 N.Y. 188, 114 N.E. 52 (1916), which actually set forth the third interpretation:

The Bankruptcy Law does not require that the property shall be obtained by the bankrupt at the instant of making the false representations nor that it shall pass directly to the bankrupt.
219 N.W. at 190, 114 N.E. 52

The case of *In re Kunkle*, 40 F.2d 563 (E.D.Mich.1930) more fully explained this third view.

The bankrupt contends that section 17a applies only to a case where the bankrupt himself obtained property for himself by such false pretenses or false representation, and that the intent and purpose of the act was not to permit him to retain such property as against the person defrauded, and at the same time secure through bankruptcy a discharge of the debt or liability arising out of the fraud. This seems to me to be begging the question. To adopt the interpretation suggested by the bankrupt would be to rewrite the section so as to read: "A discharge in bankruptcy shall release a bankrupt from all his provable debts, except such as ... are liabilities for obtaining property [for himself] by false pretenses or false representation."

If that had been the intention of the congress, the act could have been so worded. There is no exception contained in or suggested by the act as to liabilities for obtaining property by false pretenses or false representation. It applies plainly to all such obtaining of property by the bankrupt, whether for himself or for anybody else. The rule of statutory construction is that, where the language of the statute is plain, it is not susceptible to interpretation, and the letter of the law will prevail.
40 F.2d 563–564.

Although the *Kunkle* court avowed the goal of not rewriting the statute, it did, in fact, revise it. Under the *Kunkle* interpretation the statute read "a discharge in bankruptcy shall release a bankrupt from all his provable debts, except such as ... are liabilities for obtaining property [from the creditor] by false pretenses or false representation". But that interpretation would do nothing more than repeat the 7th element of common law deceit, *i.e.* damage to the creditor, *supra*. This would violate the rule of statutory construction that provides that where possible, statutes are to be given such effect that no clause, sentence, or word is rendered superfluous, contradictory, or insignificant. *E.E.O.C. v. Continental Oil Co.*, 548 F.2d 884 (10th Cir.1977).

In addition, the court must narrowly construe exceptions to discharge against the creditor and in favor of the Debtor. *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). Thus, some effect must be given to subsection (2) and the creditor must prove each element of § 523(a)(2)(A). *In re Danns*, 558 F.2d 114 (2d Cir.1977).

There is a common thread running through all the cases, and that is if in some way, directly or indirectly, the Debtor ob-

tained a benefit from his fraud, the debt will be non-dischargeable. *See Hyland, supra,* (the money was used to pay interest on loan to protect property in which Debtor had an interest); *Davis v. Howe, et al.,* 167 Okl. 454, 29 P.2d 761 (1934) (the Debtor obtained the deed to creditor's farm); *In re Pommerer,* 10 B.R. 935 (Bankr.Minn.1981) (the debtor obtained a new loan); *In re Holwerda,* 29 B.R. 486 (Bankr.M.D.Fla. 1983) (a corporation in which Debtor was a principal obtained a loan); *In the matter of Richmond,* 29 B.R. 555 (Bankr.M.D.Fla. 1983) (Debtor obtained a delay in the collection of a note by fraudulently obtaining a renewal of the note); *In re Winfree, supra,* (a corporation in which Debtor was a principal obtained a loan); and *Dunfee, supra,* (the Debtor obtained a surety bond).

Those cases that seemingly followed one of the other two theories were actually decided on other considerations. For example, in the *Rudstrom* case, *supra,* the creditor suffered no damages. So too, in the case of *In re Kriger,* 2 B.R. 19 (Bankr. Ore.1979). The case of *In re Harlan,* 7 B.R. 83 (Bankr.Ariz.1980) involved a determination that neither the assumption of a debt by the Debtor to the creditor nor the creditor's forbearance of suit against the original obligors were "property". And, in *Otto Gerdau Co. v. Radway,* 222 A.D. 107, 225 N.Y.S. 284 (1927) the court determined that the fraud occurred *after* the Debtor obtained the subject property.

This long-standing "receipt of benefits" theory could well have been altered by Congress when it enacted the present Bankruptcy Code, but it chose not to do so. This court is not compelled to unilaterally change this interpretation.

■ In this case there was no evidence that Wade, the Debtor herein, ever obtained any money, property, services, or an extension, renewal or refinancing of credit, or any benefits in connection with the pet products loan. Any benefits the court could possibly attribute as accruing to Wade would be pure speculation. The Plaintiffs have, quite simply, failed in their burden of proof under subsection (2) of § 523(a) on the pet products loan.

■ The $45,000.00 loan to Wade and Van Cleave, however, falls clearly within § 523(a)(2)(A). Wade not only made false representations of the true facts about Richland and its financial condition but concealed the true facts from Plaintiffs and indicated that all was progressing well. These facts were material to Plaintiffs. They did not want to invest in such an uncertain, chaotic enterprise. Wade knew long before Plaintiffs' investment that what he was telling the Wades of the company's progress was false. Specifically he concealed the fact that the company was not "mechanized"—a fact he knew was vital to the company's survival. Yet he concealed such facts, intending to induce Plaintiffs to invest their money. Plaintiffs did rely on Wade's misrepresentations and invested their money on the assumption that the concealed facts, *i.e.,* the extremely poor financial condition of Richland and the fact that Richland was not and would not be "mechanized" did not exist. Plaintiffs were justified in their reliance. They looked to Wade as their financial advisor, paid him a substantial fee, and expected him to recommend investments that met their stated criteria. Such reliance obviously caused Plaintiffs damage and, because of Richland's failure, Plaintiffs lost $47,200.00 (see Plaintiffs' Exhibit 50). Clearly, the Debtor obtained this money from Plaintiffs by false representations and actual fraud, and accordingly, this debt must be declared as non-dischargeable under § 523(a)(2)(A).

Plaintiffs argue that their loss on the pet products investment must be declared non-dischargeable under § 523(a)(4) because Wade defrauded them while acting in a fiduciary capacity. Even assuming Wade defrauded Plaintiffs on this investment, and there is ample evidence to support that assertion, Plaintiffs failed to prove Wade was acting in a "fiduciary capacity".

■ In order for a debt to be declared non-dischargeable under § 523(a)(4), there must have been an express trust in existence prior to or independent from the act of wrongdoing out of which the debt arose.

An implied or constructive trust is insufficient. It is axiomatic, that before there can be a trust, there must be a *res* or particular property entrusted to the fiduciary for the benefit of another. Here no funds or other property were held by Wade for the benefit of Plaintiffs in connection with the pet products transaction. Thus, there was no trust created, and no fiduciary relationship existed.

There was ample evidence that Plaintiffs and Wade had a trusting or confidential relationship. But that is not tantamount to the creation of an express trust in fact or in law.

▮ Plaintiffs also allege that Wade should respond in damages for their loss on the pet products transaction based on negligent misrepresentation, nondisclosure and concealment, and simple negligence. There was ample evidence to support Plaintiffs' claim under any of these theories. Wade was to be the "expert" hired to guide Plaintiffs in their financial investments according to Plaintiffs' stated objectives. Wade wholly failed to investigate and disclose the true nature of Ms. Rose's financial condition—a duty he undertook as Plaintiffs' financial advisor. While, as a general rule, the mere fact that an investment is not profitable will not render a financial advisor liable, here the advisor totally failed to fulfill the duty which he was paid to assume. Such failure in this case was so severe that it amounted to willful and wanton conduct, or in the very least, gross negligence, which was the cause of Plaintiffs' damage. Accordingly, Plaintiffs are entitled to judgment in the sum of $32,-643.28 (see Plaintiffs' Exhibit 51). However, Plaintiffs are only entitled to a general unsecured claim for that sum and to share pro-rata with all other general unsecured claimants in this estate.

Because of the findings and conclusions, *supra*, the court sees no purpose in ruling on the other claims or theories of Plaintiffs set forth in their complaint. However, the court reserves the right to make findings and conclusions in writing on those claims if the within order is appealed.

In connection with the Richland transaction, Plaintiffs have obtained a state court judgment against Van Cleave in the sum of $25,000.00 and Van Cleave has paid Plaintiffs $5,000.00 on that judgment. However, Van Cleave has also filed a petition for bankruptcy and the $5,000.00 paid may be a recoverable preference by Van Cleave's bankruptcy estate. Wade and his estate are entitled a set-off of any sums Plaintiffs ultimately receive from Van Cleave or his estate. Accordingly, it is

ORDERED, ADJUDGED AND DECREED that:

1. Judgment shall enter in favor of Plaintiffs and against the Defendants in their respective capacities in the sum of $47,200.00, plus interest at the legal rate and costs, less any sums Plaintiffs ultimately receive from W.R. Van Cleave or his bankruptcy estate, and this debt is declared to be non-dischargeable.

2. Judgment shall enter in favor of Plaintiffs and against the Defendants in their respective capacities in the sum of $32,643.68, which sum is declared to be a valid general unsecured claim against the bankruptcy estate of Robert L. Wade, and such debt is declared to be dischargeable.

FURTHER ORDERED that within ten (10) days of the date of this order, any party may file a written request for the withdrawal of his exhibits received in evidence or in the possession of the court. Upon conclusion of all appellate review pertinent hereto, or upon expiration of time to initiate such review, as the case may be, exhibits so requested shall be returned. Thereafter, the Clerk may destroy or otherwise dispose of any exhibits not requested and returned in accordance with this order.