**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**July 12, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

In re: STEVEN W. BLOOM,

    Debtor.

------------------------------

GLENCOVE HOLDINGS, LLC,

    Plaintiff - Appellee,

v.

STEVEN W. BLOOM,

    Defendant - Appellant.

No. 22-1005
(BAP No. 20-043-CO)
(Bankruptcy Appellate Panel)

_____

## ORDER AND JUDGMENT[*]
_____

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.
_____

Steven W. Bloom, an aircraft sales consultant and the debtor in this matter,

appeals from a United States Bankruptcy Appellate Panel of the Tenth Circuit

("BAP") opinion affirming the bankruptcy court's decision allowing Glencove

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

Holdings, LLC's ("Glencove") claim as a valid debt against Mr. Bloom and holding the debt was not dischargeable. Mr. Bloom contends the bankruptcy court erred by holding Colorado's economic loss rule did not bar Glencove's tort claims and improperly concluding the debt was excepted from discharge under 11 U.S.C. § 523(a)(2)(A) and (a)(6). Exercising jurisdiction under 28 U.S.C. § 158(d), we affirm the bankruptcy court's decision.[1]

## I.    BACKGROUND

Mr. Bloom is the sole member and manager of Bloom Business Jets, LLC ("BBJ"). BBJ, through Mr. Bloom, entered an Agent Agreement to represent Jennifer and Huw Pierce (the "Pierces") in their effort to purchase a pre-owned private jet through Glencove, a limited liability company owned and managed by the Pierces.[2] As part of the Agent Agreement, BBJ agreed to locate a private jet and act as Glencove's agent in the purchase of the jet, and Glencove agreed to pay BBJ a fee for its services. Colorado law governs the Agent Agreement. At all relevant times, Mr. Bloom acted on behalf of BBJ to represent Glencove in the purchase of the private jet.

The parties identified a private jet Glencove was interested in purchasing, Mr. Bloom recommended a target price of $3,600,000 for the jet, and Glencove

---

[1] Judge Hartz joins this order and judgment, *except for* Part II.B.2.

[2] The Pierces formed Glencove the day after the Agent Agreement was executed, but the parties agree on appeal that BBJ and Glencove were the parties to the Agent Agreement.

agreed. With Glencove's authorization, Mr. Bloom began negotiating with the seller, beginning with an offer of about $3,300,000. After receiving Glencove's initial offer, the seller counteroffered with a price of $3,400,000, which was significantly lower than Mr. Bloom expected. At this point, Mr. Bloom began lying to Glencove. He told Glencove the seller counteroffered to sell the jet for $3,775,000. In response, Glencove authorized a counteroffer of $3,550,000. Mr. Bloom then represented to Glencove that he was negotiating with the seller to sell the jet for $3,550,000. This, of course, was not true because the seller had already counteroffered to sell the jet for less than that amount. In the end, Glencove agreed to pay $3,550,000 for the jet. Meanwhile, Mr. Bloom negotiated with the seller, and they agreed to a sale price of $3,300,000. Mr. Bloom did not tell Glencove about these negotiations or the lower sale price.

Before finalizing the purchase, Haggan Aviation ("Haggan") conducted an inspection of the jet and found more than $67,000 worth of airworthy items that needed to be repaired. Glencove signed a conditional acceptance, agreeing to accept the jet subject to the seller fixing the airworthy items. The seller initially refused to perform any of the repairs and would only sell the jet in as-is condition. Mr. Bloom then convinced Haggan to reduce the number of airworthy items that needed to be repaired, which significantly reduced the total estimate. Mr. Bloom did not apprise Glencove of any of these developments. Instead, he represented that the seller would pay for all the repairs in the original estimate even though only a portion of those repairs were completed prior to the sale.

3

Mr. Bloom then created Big Horn Exploration, LLC ("Big Horn"), which purchased the jet from the seller for $3,300,000. Immediately thereafter, Big Horn sold the jet to Glencove for $3,550,000. As a result of Mr. Bloom's lies, Glencove paid an additional $250,000 for the jet, and that amount was distributed between Mr. Bloom's attorney, an aircraft finance company, and BBJ. The bankruptcy court did not find Mr. Bloom personally received any of the money.

Glencove then hired BBJ to manage the jet's operations. BBJ eventually filed a state court lawsuit against Glencove for a dispute arising out of the management agreement. Discovery in that matter revealed the fraud committed during the sale, and Glencove brought counterclaims against Mr. Bloom and others who were involved. Mr. Bloom filed for bankruptcy, and Glencove brought an adversary proceeding asserting its tort claims as a debt against Mr. Bloom. We refer to the debt Glencove asserted as the Glencove Claim. In the adversary proceeding, Glencove brought claims for the nondischargeability of the Glencove Claim.

The bankruptcy court held a trial on the tort claims and allowed the Glencove Claim in the amount of $458,470 for fraud by false representation and fraudulent concealment. The bankruptcy court also concluded the Glencove Claim was not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6). Mr. Bloom appealed to the BAP, arguing in part that (1) the bankruptcy court should not have allowed the Glencove Claim because Colorado's economic loss rule bars the fraud and fraudulent concealment claims and (2) the Glencove Claim is dischargeable. The BAP affirmed the bankruptcy court's ruling. Mr. Bloom now appeals to this court.

## II.    DISCUSSION

When a party appeals a decision by the BAP, "we treat the BAP as a subordinate appellate tribunal whose rulings are not entitled to any deference," so "we review only the [b]ankruptcy [c]ourt's decision." *In re Tung Thanh Nguyen*, 783 F.3d 769, 772 (10th Cir. 2015) (quotation marks omitted). "We review matters of law de novo, and we review factual findings made by the bankruptcy court for clear error." *Id.* (quotation marks omitted).

On appeal, Mr. Bloom contends the bankruptcy court erred when it determined the Glencove Claim was valid. He says Colorado's economic loss rule bars Glencove from recovering on its fraud and fraudulent concealment claims against him. He also argues the bankruptcy court erred by concluding the debt is not dischargeable. We address each argument in turn.

### A.    *Economic Loss Rule*

Mr. Bloom argues primarily that the bankruptcy court erred by allowing the Glencove Claim because Colorado's economic loss rule prevents Glencove from recovering on its state fraud and fraudulent concealment claims against him. *See Grogan v. Garner*, 498 U.S. 279, 183 (1991) ("The validity of a creditor's claim is determined by rules of state law."). Whether the economic loss rule bars a tort claim "is an issue of law we review *de novo*." *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009) (quotation marks omitted).

Colorado's economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort

5

claim for such a breach absent an independent duty of care under tort law." *Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1264 (Colo. 2000). To determine whether the economic loss rule bars a tort claim in Colorado, courts consider "the source of the duty that forms the basis of the action." *Id.* at 1262. If the contract is the source of the duty, then the economic loss rule bars tort claims for purely economic loss. *Id.* Otherwise, the economic loss rule does not bar the claim. *Id.* The Colorado Supreme Court also explained, "certain common law claims that sound in tort and are expressly designed to remedy economic loss," such as common law fraud or negligent misrepresentation, "may exist independent of a breach of contract claim." *Id.* at 1263. Such claims are outside the scope of the economic loss rule. *Id.*

After *Alma*, some divisions of the Colorado Court of Appeals held the economic loss rule barred post-contractual fraud claims related to the performance of the contract. *See Top Rail Ranch Estates, LLC v. Walker*, 327 P.3d 321, 328–29 (Colo. App. 2014); *Former TCHR, LLC v. First Hand Mgmt. LLC*, 317 P.3d 1226, 1232–33 (Colo. App. 2012); *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291–95 (Colo. App. 2009). These divisions reasoned that all contracts contain the implied covenant of good faith and fair dealing, and the implied covenant of good faith and fair dealing includes the duty not to commit fraud. *See Top Rail Ranch Estates*, 327 P.3d at 329; *Former TCHR*, 317 P.3d at 1233; *Hamon Contractors*, 229 P.3d at 292–93. Accordingly, the courts concluded the duty to not commit post-contractual fraud did not arise independent of the contract. *See Top Rail*

6

*Ranch Estates*, 327 P.3d at 329; *Former TCHR*, 317 P.3d at 1233; *Hamon Contractors*, 229 P.3d at 293–95.

Recently, however, the Colorado Supreme Court suggested this is not the proper understanding of the economic loss rule. In *Bermel v. BlueRadios, Inc.*, the Colorado Supreme Court explained it had previously applied the economic loss rule only "to bar common law tort claims of negligence or negligent misrepresentation." 440 P.3d 1150, 1155 (Colo. 2019). The *Bermel* court also clarified in a footnote that "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation." *Id.* at 1154 n.6

Mr. Bloom asks us to apply the analysis in *Top Rail Ranch Estates*, *Former TCHR*, and *Hamon Contractors*, and to ignore the contrary language in *Bermel*. Accordingly, Mr. Bloom contends the economic loss rule bars Glencove's fraud by false representations and fraudulent concealment claims against him because (1) he is a member of BBJ who acted on behalf of BBJ, an entity that had a contractual relationship with Glencove when the fraud occurred; (2) the Agent Agreement included the implied covenant of good faith and fair dealing, which required BBJ not to act fraudulently; and (3) Glencove experienced only economic damages. Thus, according to Mr. Bloom, these claims arise from a breach of an implied contractual duty that resulted only in economic loss, which bars Glencove from recovering in tort.

7

As an initial matter, we note Mr. Bloom does not personally have a contractual relationship with Glencove because BBJ, not Mr. Bloom, entered the agreement with Glencove. This means Mr. Bloom did not owe any contractual duties to Glencove, and Glencove cannot bring any contract claims against Mr. Bloom. *See Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1195 (Colo. App. 2008) (holding the economic loss rule does not apply because the plaintiff had not entered into the contract and had no contractual remedies). As such, the economic loss rule would not normally apply to bar any tort claims against Mr. Bloom. *Id.* However, "[w]hen the economic loss rule bars a claim against a corporate entity, it may also bar claims against that entity's officers and directors, even if the officers and directors were not parties to the contract at issue," when "the officers' and directors' duties, rights, obligations, or liabilities arise from the contract between the corporate entity and another." *Former TCHR*, 317 P.3d at 1232; *see also Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo. App. 2004) (applying the economic loss rule to the sole shareholder of the corporate party to the contract). Because Mr. Bloom is the sole member of BBJ, we must therefore determine the source of Mr. Bloom's duty not to act fraudulently. For the reasons below, we hold the duty not to commit fraud arises from the common law, independent of the Agent Agreement.

As a matter of state law, we must attempt to determine how the Colorado Supreme Court would rule on this issue. *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657,

8

666 (10th Cir. 2007).[3] As noted, the Colorado Supreme Court looks to whether the tort claim arises from a duty independent of the contract, and if not, then the economic loss rule applies. *Alma*, 10 P.3d at 1263. As an example, the Colorado Supreme Court said intentional tort claims such as common law fraud generally arise from duties independent of contracts and are outside the economic loss rule. *Id.*; *Bermel*, 440 P.3d at 1154 n.6; *but see Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 506 P.3d 108, 124–26 (Colo. App. 2021) (concluding the economic loss rule bars a fraud claim where the contract expressly waives the damages sought via the fraud claim). The common law fraud and fraudulent concealment claims are both tort claims that arise independent of a contract, so they would not be barred by the economic loss rule.

Mr. Bloom does not agree that the *Bermel* footnote limiting the application of the economic loss rule is binding. Instead, he contends the footnote is only dicta and urges us to rely on the pre-*Bermel* Colorado Court of Appeals opinions that held the economic loss rule bars post-contractual fraud claims. Even if the footnote in *Bermel*

---

[3] Mr. Bloom moved to certify the question of whether the economic loss rule bars claims for intentional torts to the Colorado Supreme Court. We have discretion to certify a question of state law to a state supreme court when state law permits and the question "(1) may be determinative of the case at hand and (2) is sufficiently novel that we feel uncomfortable attempting to decide it without further guidance." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). Here, the Colorado Supreme Court has provided guidance about how the economic loss rule applies in *Alma v. AZCO Constr., Inc.*, 10 P.3d 1256 (Colo. 2000), and more recently in *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150 (Colo. 2019). Taking these cases into consideration, this question is not so novel that we feel uncomfortable deciding it without further guidance. Therefore, we deny the motion to certify.

discussing the application of the economic loss doctrine to intentional torts is dicta, *see Dream Finders*, 506 P.3d at 122 (referring to the footnote as "dicta"), we may consider Colorado Supreme Court dicta because it "represents the court's own comment on the development of Colorado law," *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1093 (10th Cir. 2010).

Importantly, Mr. Bloom's interpretation of the economic loss rule directly conflicts with the Colorado Supreme Court's comment on the development of Colorado law. In Mr. Bloom's view, all post-contractual fraud claims would be barred by the economic loss rule because all contracts in Colorado include the implied covenant of good faith and fair dealing. *See* Colo. Rev. Stat. § 4-1-304 ("Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement."). Thus, the economic loss rule would always be available to shield intentional tortfeasors from liability for post-contract misconduct that breaches the implied covenant of good faith and fair dealing. The Colorado Supreme Court, however, explained "the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation." *Bermel*, 440 P.3d at 1154 n.6. This language is not up for debate; it clearly suggests the Colorado Supreme Court would disagree with Mr. Bloom's understanding of the economic loss rule.

In applying the Colorado Supreme Court's understanding of the economic loss rule, as we must, we conclude the economic loss rule does not bar Glencove's fraud and fraudulent concealment claims against Mr. Bloom. The claims are both

10

intentional torts that arise from the common law—that is, they arise from duties independent of the Agent Agreement. *Alma*, 10 P.3d at 1263. Without an express waiver of damages from fraud, the economic loss rule does not bar these intentional tort claims. *See id.*; *Dream Finders*, 506 P.3d at 122 (recognizing *Bermel* did not create a bright line rule prohibiting the economic loss rule from barring all intentional torts). Here, there is no such waiver within the Agent Agreement. Thus, the bankruptcy court did not err by holding Mr. Bloom's duty not to commit fraud arose independent of the Agent Agreement and allowing the Glencove Claim as a valid debt.

### B.    *Exceptions to Discharge*

Having concluded the bankruptcy court did not err in allowing the Glencove Claim as a valid debt, we turn now to the dischargeability of that debt. *See In re Thompson*, 555 B.R. 1, 8 (B.A.P. 10th Cir. 2016) (explaining a court must first determine whether the debt is valid then determine whether it is dischargeable). The Bankruptcy Code was enacted to give debtors a fresh start. *In re Merrill*, 252 B.R. 497, 503 (B.A.P. 10th Cir. 2000). Accordingly, "most debts are dischargeable in bankruptcy." *Id.* However, 11 U.S.C. § 523 lists the circumstances in which a debt is not dischargeable. The bankruptcy court held the Glencove Claim was excepted from discharge under § 523(a)(2)(A) and (a)(6). Mr. Bloom argues this was in error.

"We review a bankruptcy court's construction of the Bankruptcy Code de novo." *In re McDaniel*, 973 F.3d 1083, 1092 (10th Cir. 2020) (quotation marks omitted). We review factual findings related to the dischargeability of a debt for clear

11

error. *In re Young*, 91 F.3d 1367, 1370 (10th Cir. 1996). To promote the policy of providing debtors with a fresh start, "exceptions to discharge are to be narrowly construed, and . . . doubt is to be resolved in the debtor's favor." *In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997).

1.      **11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) excepts from discharge a debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

We have held a claim is not dischargeable pursuant to this subsection when (1) "[t]he debtor made a false representation," (2) "the debtor made the representation with the intent to deceive the creditor," (3) "the creditor relied on the representation," (4) "the creditor's reliance was reasonable," and (5) "the debtor's representation caused the creditor to sustain a loss." *Young*, 91 F.3d at 1373. Mr. Bloom contends the language of the statute also requires the debtor to have personally obtained money, property, services, or credit from the false pretenses, false representation, or actual fraud. Mr. Bloom further argues the bankruptcy court's findings do not satisfy that requirement because the court did not find he personally obtained money from the fraud. We begin by addressing Mr. Bloom's argument.

Courts have identified three views about whether the debtor must have personally obtained the money, property, or services to except the debt from discharge under § 523(a)(2)(A). *In re Wade*, 43 B.R. 976, 980–82 (Bankr. D. Colo. 1984), *abrogated on other grounds by Cohen v. de la Cruz*, 523 U.S. 213 (1998), *as*

12

*recognized by In re Denbleyker*, 251 B.R. 891 (2000). First, some courts have suggested the debtor must personally receive the money, property, or services for the debt to be excepted from discharge under § 523(a)(2)(A). *Id.* at 980–81 (citing *Rudstrom v. Sheridan*, 142 N.W. 313, 314 (Minn. 1913)). However, we have found no courts that applied this narrow interpretation of the statute.[4] *See In re Ritz*, 567 B.R. 715, 763 (Bankr. S.D. Tex. 2017) ("There are no circuit courts that have adopted the first view."). Second, some courts apply the "receipt of benefits" test which requires the debtor to have received a benefit from the money, property, services, or credit to render the debt nondischargeable. *Wade*, 43 B.R. at 981 (citing *Hyland v. Finch*, 178 N.Y.S. 114, 115 (1919)). Third, some courts have held that the debtor need not have personally obtained or benefited from the money or property obtained by fraud. *Id.* (citing *In re Kunkle*, 40 F.2d 563, 563–64 (E.D. Mich. 1930)). Mr. Bloom argues we should adopt the first view.

Importantly, the Supreme Court has provided some guidance for interpreting § 523(a)(2)(A) in *Cohen v. de la Cruz*, 523 U.S. 213 (1998). There, the Supreme Court considered whether § 523(a)(2)(A) bars the discharge of treble damages awarded against the debtor for fraud or whether the exception to discharge is limited

---

[4] Courts have determined this view in *Rudstrom v. Sheridan*, 142 N.W. 313, 314 (Minn. 1913), was merely dicta and was not the holding of the court. *See, e.g.*, *In re Bilzerian*, 100 F.3d 886, 890 n.3 (11th Cir. 1996); *In re Ward*, 115 B.R. 532, 538 (W.D. Mich. 1990); *In re Wade*, 43 B.R. 976, 980–81 (Bankr. D. Colo. 1984), *abrogated on other grounds by Cohen v. de la Cruz*, 523 U.S. 213 (1998), *as recognized by In re Denbleyker*, 251 B.R. 891 (2000).

to the value of the money, property, services, or credit the debtor actually obtained through fraud. *Id.* at 215. In analyzing the statute, the Court explained "the phrase 'to the extent obtained by' . . . does not impose any limitation on the extent to which 'any debt' arising from fraud is excepted from discharge." *Id.* at 218 (quoting 11 U.S.C. § 523(a)(2)(A)). The *Cohen* Court held § 523(a)(2)(A) prevents the discharge of all liability arising from the fraud, including treble damages which do not represent money the debtor obtained. *Id.* at 215.

Prior to the *Cohen* decision, the circuit courts that reached the issue required the debtor to have received a benefit from the fraud to render the claim nondischargeable under the subsection. *Muegler v. Bening*, 413 F.3d 980, 983 (9th Cir. 2005) (collecting pre-*Cohen* cases applying the receipt-of-benefits requirement from the Ninth, Eleventh, and Fifth Circuits). With the language in *Cohen*, however, the Supreme Court applied a broader interpretation of § 523(a)(2)(A) such that the "obtained by" language amounts to a causation requirement. *Denbleyker*, 251 B.R. at 896–97 (concluding the *Cohen* analysis treated the phrase "obtained by" as if it was referring simply to causation); *see also Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 365 (2016) (holding any debts traceable to a fraudulent conveyance is nondischargeable under § 523(a)(2)(A) even though the debtor did not receive the funds in the fraudulent conveyance). That is, it requires only that the debt be traceable to fraud. *Husky Int'l Elecs.*, 578 U.S. at 365; *see also Denbleyker*, 251 B.R. at 896–97.

Since *Cohen*, an increasing number of courts have applied the third view—that the debtor need not have personally obtained or benefited from the money or property obtained by fraud. *Denbleyker*, 251 B.R. at 897–99; *Muegler*, 413 F.3d at 983–84 (holding the receipt-of-benefits element under § 523(a)(2)(A) no longer applies after *Cohen*); *In re M.M. Winkler & Assocs.*, 239 F.3d 746, 749–51 (5th Cir. 2001) (considering Supreme Court precedent and clarifying that § 523(a)(2)(A) does not require a "receipt of benefit" to except a debt from discharge); *In re Pleasants*, 219 F.3d 372, 375 (4th Cir. 2000) (applying *Cohen* and holding § 523(a)(2)(A) applies even when "no portion of a creditor's claim was literally transferred to the fraudulent debtor"); *In re Speisman*, 495 B.R. 398, 403 (Bankr. N.D. Ill. 2013) (collecting cases holding § 523(a)(2)(A) does not require the debtor to have received a benefit); *cf. In re Rountree*, 330 B.R. 166, 170–75 (E.D. Va. 2004) (holding the creditor must have lost some money, property, or services as a result of the fraud to satisfy the requirements of § 523(a)(2)(A)). We have yet to decide which approach applies.

With the broad interpretation in *Cohen*, the Supreme Court has suggested § 523(a)(2)(A) does not require that the debtor personally obtain money, property, or services to render the debt nondischargeable. This leaves open the question of whether the debtor needs to have received a benefit from the fraud to be excepted from discharge or whether the creditor must show only that the debt arose from the debtor's fraud. We need not decide this question, however, because even if we apply the receipt-of-benefits requirement, the bankruptcy court's findings support the nondischargeability of the Glencove Claim under § 523(a)(2)(A). Specifically, the

15

bankruptcy court found Mr. Bloom is the sole member of BBJ and BBJ obtained money from Mr. Bloom's fraud. Mr. Bloom thus received a benefit from the fraud. *See In re Grasso*, 497 B.R. 434, 443 (Bankr. E.D. Pa. 2013) (concluding the debtor received a benefit from the alleged fraud because he was a managing member and held an ownership interest in the entity that received the proceeds of the loan); *In re Holwerda*, 29 B.R. 486, 489 (Bankr. M.D. Fla. 1983) (explaining the defendant received a benefit from the fraud because he was a principal of the corporation that received the loan). Therefore, even if the receipt-of-benefits requirement applies, that requirement has been met.

Moreover, the bankruptcy court did not commit clear error by finding the Glencove Claim meets the other elements of § 523(a)(2)(A) because there was evidence in the record supporting those findings. *See Young*, 91 F.3d at 1373 (listing the elements required for nondischargeability under § 523(a)(2)(A)). Specifically, there was evidence that Mr. Bloom made a false representation with the intent to deceive Glencove when he lied about the negotiations with the seller and the amount of the sale price. There was also evidence that BBJ, through Mr. Bloom, acted as an agent for Glencove pursuant to the Agent Agreement, and Glencove reasonably relied on its agent's representations about the negotiations. Evidence also supported a finding that Mr. Bloom's lies caused Glencove to sustain a loss of at least the difference between the seller's price and the price Glencove agreed to pay as well as the difference between the amount of repairs that Glencove believed would be completed and the amount of repairs that were completed. Thus, Glencove has shown

16

the necessary elements, and the bankruptcy court did not err by holding the Glencove Claim was nondischargeable under § 523(a)(2)(A).

**2.       11 U.S.C. § 523(a)(6)**

The bankruptcy court also concluded the Glencove Claim was not dischargeable under 11 U.S.C. § 523(a)(6). Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." Mr. Bloom argues this subsection does not apply because (1) § 523(a)(6) cannot apply when the more specific exception to discharge in § 523(a)(2)(A) applies and (2) the Glencove Claim does not meet the willful-injury or malicious-injury requirements for nondischargeability under § 523(a)(6).

While there are meaningful distinctions between § 523(a)(2)(A) and § 523(a)(6), a debt that is nondischargeable under one subsection may also be nondischargeable under the other so long as all the requirements are met under both subsections. *Husky Int'l Elecs.*, 578 U.S. at 363–64. Thus, to determine nondischargeability under § 523(a)(6) we must review whether Mr. Bloom caused both a willful and malicious injury. *See In re Moore*, 357 F.3d 1125, 1129 (10th Cir. 2004) (noting nondischargeability under § 523(a)(6) requires both willful injury and malicious injury).

"Willful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property." *In re Longley*, 235 B.R. 651, 657 (B.A.P. 10th Cir. 1999). The Supreme Court suggested the willfulness requirement is more akin to intentional torts than negligent or reckless torts or a "knowing breach of

17

contract." *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62 (1998). Mr. Bloom, therefore, argues the willful-injury requirement cannot be met because Colorado's economic loss rule bars any tort claims against him arising out of the Agent Agreement. We already concluded Colorado's economic loss rule does not apply, so Mr. Bloom's argument against the willful-injury finding cannot succeed. Moreover, the bankruptcy court did not clearly err by finding a willful injury because there is evidence that Mr. Bloom deceived Glencove with the intent to make Glencove pay an extra $250,000 for the private jet.

Next, malicious injury requires "evidence of the debtor's motives." *In re Smith*, 618 B.R. 901, 919 (B.A.P. 10th Cir. 2020) (quotation marks omitted). To be malicious, the debtor must have "acted with a culpable state of mind vis-à-vis the actual injury caused the creditor." *Id.* (quotation marks omitted). The malicious element requires that the action be "wrongful and without just cause or excuse." *Id.* Mr. Bloom, however, argues there is no malicious injury here because there is no evidence that he had personal animus against Glencove or the Pierces. This argument was not raised before the bankruptcy court or the BAP, so the argument is forfeited, and we would normally decline to address it. *In re Williams*, 49 F. App'x 845, 849 (10th Cir. 2002) (unpublished) (applying the preservation rule to a bankruptcy appeal); *see also United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) (describing the principles of forfeiture and waiver). Even considering it on appeal, however, Mr. Bloom cannot succeed because personal animus is not a requirement for malicious injury. *Smith*, 618 B.R. at 919 (describing the requirements for

18

malicious injury); *see also Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (explaining malicious injury means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will" (quoting *In re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996))).

The bankruptcy court did not commit clear error in finding malicious injury because evidence in the record suggests Mr. Bloom deceived Glencove in order to benefit himself and his colleagues through BBJ. This does not constitute a just cause or excuse and supports a finding that Mr. Bloom "acted with a culpable state of mind vis-à-vis the actual injury caused" to Glencove. *Smith*, 618 B.R. at 919. Therefore, the bankruptcy court did not err by concluding the Glencove Claim was nondischargeable under § 523(a)(6).

## III.    CONCLUSION

Because the bankruptcy court did not err by allowing the Glencove Claim and concluding it was not dischargeable, we AFFIRM the bankruptcy court's decision in this matter. We also DENY Mr. Bloom's Motion for Certification of Question of State Law.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

19